FILED
2020 Jan-21  AM 09:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE NORHTERN DISTRICT OF ALABAMA EASTERN DIVISION

|  |  |  |
|---|---|---|
| **MICHAEL C. THREATT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.** |
| | ) | |
| | ) | |
| **SYLACAUGA HOUSING AUTHORITY,** | ) | <u>**Jury Demand**</u> |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>COMPLAINT</u>

## <u>INTRODUCTION</u>

1. This suit is authorized and brought to secure protection of and to redress the deprivation of rights secured by Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000 *et seq*.

2. This suit is also authorized and brought to secure protection of and to redress the deprivation of rights secured by the False Claims Act ("FCA"), codified at 31 U.S.C. § 3729 et seq., when Plaintiff reported what he identified as Defendant's fraudulent billing practices, and Defendant terminated Plaintiff's employment in retaliation, in violation of 31 U.S.C. § 3730(h).

3.  This suit is also authorized by the Fair Housing Act ("FHA"), codified at 42
    U.S.C § 3601 et seq., when Plaintiff reported Defendant's fair housing
    violations and Defendant terminated Plaintiff's employment, in violation 42
    U.S.C § 3617.

## JURISDICTION AND VENUE

4.  The district court has federal question jurisdiction over this matter pursuant
    to 28 U.S.C. § 1331, 31 U.S.C. § 3730(h)(2), and 31 U.S.C. § 3732(a).
    Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42
    U.S.C. 2000e et seq., the False Claims Act ("FCA"), codified at 31 U.S.C. §
    3729 et seq., and the Fair Housing Act ("FHA"), codified at 42 U.S.C §
    3601 et seq..

5.  Plaintiff has complied with all jurisdictional prerequisites to action under
    Title VII of the Civil Rights Act of 1964 as amended, including having
    exhausted his administrative remedies.

6.  All of the acts committed by Defendant occurred within the Northern
    District of the State of Alabama. The unlawful employment practices
    described herein were committed in Sylacauga, Alabama. Sylacauga is
    located in Talladega County, Alabama, and, accordingly, venue lies in the
    United States District Court for the Northern District of Alabama, Eastern
    Division pursuant to 28 U.S.C. § 1391(b), 31 U.S.C. § 3730(h)(2), and 31

U.S.C. § 3732(a).

## PARTIES

7.  Plaintiff Michael C. Threatt is a citizen of the United States of America, over the age of nineteen (19) years, a resident of the State of Alabama, and was at all times relevant an "employee" of Defendant.

8.  Defendant is a domestic non-profit corporation functioning within the State of Alabama and was at all times relevant Plaintiff's "employer." Defendant is a Public Housing Authority ("PHA") receives federal funding i.e. grants and subsidies through the U.S. Department of Housing and Urban Development.

## ADMINISTRATIVE PROCEDURE

8.  Within 180 days of the occurrence of the acts of which Plaintiff complaints, Plaintiff filed charges of employment discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").

9.  On or about November 1, 2019, the EEOC issued a "Notice of Rights" to Plaintiff,  entitling Plaintiff to institute a civil action in the appropriate Federal District  Court within ninety (90) days of the date of receipt. (Attached- Exhibit 1)

## FACTS

10. Plaintiff, Michael C. Threatt, is an African American male under the age of 40 years old.

11. On or about November 2, 2017, Plaintiff executed an Employment Agreement with the Sylacauga Housing Authority ("SHA") and was hired as the Executive Director and as Secretary/Treasurer of the Board of Commissioners of the Sylacauga Housing Authority.

12. The SHA Board of Commissioners is the governing body that determines policies and resolutions for the SHA. The Board approves decisions that chart the direction of current and future programs and authorizes the actions of the Chief Executive Officer.

13. As of the date of Plaintiff's hire (11/2017), the SHA Board of Commissioners consisted of the following:

    a. Priscilla Cleveland (served four (4) terms)
        i. Appointed: 1995
        ii. Term Expires: 2019 (retired January 2019 after 24 years)
    b. Marvin Miller, Chairman (served three (3) terms)
        i. Appointed: 2008
        ii. Term Expires: 2023 (resigned February 2019)
    c. Matt Hubbard
        i. Appointed: 2009 (serving third (3rd) term)
        ii. Term Expires: 2020
    d. William "Bill" Roberts (served two (2) terms)
        i. Appointed: 2011
        ii. Term Expires: 2021 (resigned May 2019)
    e. Alma Jean Cook, Vice Chair (serving first (1st) term)
        i. Appointed: 2017
        ii. Term Expires: 2022

14. Current SHA Board of Commissioners are as follows:

    a.  Matt Hubbard
        i.  Appointed: 2009
        ii.  Term Expires: 2020
    b.  Phillip Morris
        i.  Appointed: 2019 (appointed May 2019)
        ii.  Term Expires: 2021
    c.  Alma Jean Cook, Vice Chair
        i.  Appointed: 2017
        ii.  Term Expires: 2022
    d.  Patrick Lozito, Chairman
        i.  Appointed: 2019 (appointed February 2019)
        ii.  Term Expires: 2023
    e.  James Adams
        i.  Appointed: 2019 (appointed January 2019)
        ii.  Term Expires: 2024

15. During Plaintiffs' nearly two (2) year tenure with SHA, the SHA Board of Commissioners has experienced numerous personnel changes, and many of the Board of Commissioners lacked basic training on FHA/HUD regulations, public housing, nonprofit management, and Robert's Rules of Order.

16. Pursuant to the SHA By-laws, the Mayor of the City of Sylacauga has the sole authority to appoint members to the five (5) member Board of Commissioners.

17. At all times relevant and since 2016, Mr. Jim Heigl ("Mayor Heigl") has served as the Mayor of City of Sylacauga.

18. Plaintiff was tasked with supervising and being responsible for all public housing management, maintenance, development, and construction programs undertaken by SHA and was responsible for and exercise general supervision for the proper and efficient performance of duties of all other employees within the established operating personnel policies of this organization. The Plaintiff's responsibilities, including managing daily operations, including personnel matters such as the following.

    a.  Developing, planning, and coordinating effective management of the day-to-day operations of the SHA which includes strategic planning and accountability for implementation of policies and procedures;

    b.  Analysis of business intelligence data to support the long-term sustainability of the SHA and to further ensure compliance that the SHA met basic minimum standards and regulations set by HUD.

19. On or about August 22, 2018, Plaintiff selected and hired Heather Mueller ("Mueller"), as the SHA Chief Financial Officer ("CFO"").

20. On or about August September 5, 2018, Plaintiff selected and hired Heather Mueller Danielle Womack, ("Womack"), as the SHA Chief Housing Officer ("CHO").

21. On or about September 22, 2018, Plaintiff selected and hired Heather Mueller Nicole Daniels ("Daniels"), as the SHA Chief Human Resources Officer ("CHR").

22. Plaintiff, as Executive Director (2017-2018) and then Chief Executive Officer (2018-2019), along with Mueller, Womack, and Daniels collectively comprised SHA's Executive Leadership Team.

23. Mueller, Womack and Daniels reported directly to the Plaintiff.

24. In September 2018, Plaintiff and the Executive Leadership Team became aware of what they believed to be Defendant's fraudulent billing practices.

25. Plaintiff and the Executive Leadership Team began a search for a vendor to conduct a forensic audit.

26. At Defendant's September 2018 Board of Commissioners meeting Plaintiff reported the fraudulent billing practices discovered by the Executive Leadership Team.

27. In October 2018, a vendor for the forensic audit was selected and presented to the Board.

28. Mueller, then-SHA CFO, was required to present the vendor to the Board due to the cost of the audit.

29. The forensic audit would cover the time period from June 20, 2014 through 2018.

30. The time period for the forensic audit was before the hiring of the full Executive Leadership Team.

31. Upon concluding the audit, the vendor provided a "Forensic Review" report (the "report").

32. The report stated that the audit occurred due to the "discovery of certain transactions of a dubious nature."

33. During the January 31, 2019 Board meeting, while the draft forensic audit and report was presented by a 3rd Part Vendor,

   a. Commissioner Matt Hubbard asked, "Do we have to report this to HUD, HUD OIG, or anyone else, and can we keep it here just with the Board at our level?"

34. In February 2019, the completed forensic audit and report were presented to the Board.

35. The "Executive Summary" portion of the report contained the following results, among others:

   a. "[W]e are unable to determine the proper procurement of the items identified."

   b. "[W]e found that essentially 100% of the disbursement reviewed lacked documented evidence of approval."

c.  "We were unable to determine if the Housing Authority adhered to its procurement policy and procedures for credit card expenditures."

d.  "We were unable to determine if non-payroll payments to employees were properly authorized or if select non-payroll payments to employees were allowable costs and adequately supported."

e.  "[W]e were unable to determine if…tenant payments were allowable costs and whether these payment were properly authorized."

f.  "We were unable to determine if the Housing Authority adhered to its procurement policy HUD regulations for contract labor and services. We identified at least five vendors/payees with aggregate payments that exceed $25,000 in one year and several others whose aggregate payments were between $2,001 and $25,000…"

g.  "We were unable to obtain any contract information for five [individuals] over the $25,000 threshold. Overall, the contract information that was available for review was minimal and was limited to contracts during the fiscal year ended June 30, 2018."

36. Based upon the information in the report, Plaintiff and the Executive Leadership Team worked to correct the Defendant's fraudulent billing practices within their departments.

Michael C. Threatt – Sylacauga Housing Authority                    9
The Rice Firm, LLC

37. During his tenure as CEO of SHA, Plaintiff experienced a culture of racial animus and hostility that progressively worsened as the Plaintiff performed his job duties and as he identified issues within the SHA Board of Commissioners' practices, including but not limited to the following.

    a. Discrimination in the provision of public housing – SHA used Sylavon Court as elderly and disabled housing to prevent families and African Americans from residing at Sylavon Court;

    b. Discrimination, nepotism, and unlawful employment practices;

    c. Failure to follow Procurement policy and the HUD Procurement Handbook in the issuance of Request for Proposals (RFPs), Invitation for Bids (IFBs), Request for Quotes (RFQ) and avoid any conflict of interest, kickbacks, and bribery with SHA contracts.

    d. Failed to adhere to Section 3 of the Housing and Urban Development Act of 1968, 24 CFR, and 2 CFR;

        i. The SHA is a direct recipient of HUD funding, and PHAs regardless of size or number of units are required to comply with Section 3;

        ii. Section 3 requires that the SHA through the "greatest extent feasible" provide employment, training, and business opportunities that is directed to low and very-low income individuals;

        iii. The SHA shall establish goals for participation by small businesses, minority-owned businesses, women-owned businesses, labor surplus area businesses, and Section 3 business concerns for SHA contracts and subcontracts;

        iv. Section 3 refers to hiring practices done by SHA who is considered a Section 3 employer regardless of the position that is being recruited for, and this is mandated for all capital funds, operating funds, and development funds;

    e. Creating and fostering a culture of racial animus and racial bias within the SHA's organizational culture;

    f. Failure to adhere to the basic reporting and recording requirements of the FHA/HUD in the utilization of federal funds;

    g. Failure to follow basic rules of project-based budgeting, accounting, and reporting, and generally accepted accounting principles (GAAP);

    h. Mismanagement, and misallocation of federal funds;

i.   Lack of internal controls and internal policies to ensure transparency, accountability and general checks and balances;

38. During the June 21, 2019 Board meeting, Plaintiff and the Executive

Leadership Team reported the efforts each department made to correct

Defendant's fraudulent billing practices.

39. Plaintiff and the Executive Team in an effort to promote compliance,

transparency, and general professionalism, without limitation, following

actions were undertaken.

a.   Forensic Audit (conducted by independent 3rd party vendor);
b.   Fiscal Audit (conducted by independent 3rd party vendor);
c.   Revised Policies & Procedures including Procurement Policy to be consistent with FHA/HUD regulations and memorialized the same in the SHA Employee Handbook (conducted by independent 3rd party vendor);
d.   Board Assessment and Creation of Board Performance Enhancement Plan;
e.   Created Board Email Addresses (@sylacaugaha.com) Microsoft Office 365;
f.   Promote Affirmatively Furthering Fair Housing (AFFH) through activities such as hosting a Fair Housing Symposium during Fair Housing Month and provided a copy of "The Color of Law Book" to the Board of Commissioners and local elected officials;
g.   Held targeted Committee Meetings (Executive Operations, Fiscal Operations, Housing Operations, Human Resources Operations);
h.   Revised SHA Website to include Staff Portal and Board Portal for recording and documenting, financial information, Board Resolutions and Board Minutes;
i.   Submitted Reports, Claims, Complaints to HUD, HUD-Office of Inspector General (OIG), & Department of Justice (DOJ);

40. Creation of a secure Board Portal on the SHA Website for uploading and

storing budgets and budget revisions, other financial information, board

resolutions, meeting agendas, meeting minutes, policies, development

updates;

41. Resolution presented by Plaintiff and to start monitoring Board Performance

Enhancement Plan based on failing Board Assessment (47%: 135/285) by

the Board of Commissioners.

42. At the direction of Plaintiff, Mueller, and in accordance with her roles and

duties as CFO, informed the Board that Executive Leadership Team cut

improper spending with regards to wages, vendors, services, and equipment.

43. At the direction of Plaintiff, Mueller, and in accordance with her roles and

duties as CFO, informed the Board that the Executive Leadership Team has

implemented consistent, fair, and effective fiscal management practices such

as checks and balances (e.g., internal and fiduciary controls), new fiscal

policies including a new procurement policy, and establishing procedures in

accordance with HUD requirements.

44. At the direction of Plaintiff, Womack, and in accordance with her roles and

duties as CHO, informed the Board that the Executive Leadership Team has

transitioned from "centralized public housing operations" and implemented

consistent, fair, and effective Asset Management Project (AMP) practices in

accordance with HUD requirements to transition to the AMP model that

resulted in an increase in occupancy, rent collections, preventive maintenance, public safety, UPCS inspections score, and lease compliance.

45. At the direction of Plaintiff, Daniels, and in accordance with her roles and duties as CHRO, informed the Board that the Executive Leadership Team has implemented consistent, fair, and effective human resources practices that included the first update to the SHA Employee Handbook since 2005, performance evaluations, and change management to create to high-performing organizational culture.

46. At the direction of Plaintiff, Daniels, and in accordance with her roles and duties as CHRO, informed the Board that the Executive Leadership Team also has started to comply with the Section 3 hiring practices requirement that the "SHA operate as a Section 3 employer" according to HUD mandates as it relates to hiring low and very-low income individuals.

47. On July 15, 2019, Plaintiff informs Defendant of the existence of lead-based paint in a real property owned by SHA and leased by the nonprofit Talladega Clay Randolph Child Care ("TCRC") Head Start.

48. After the July 19, 2019, Board meeting, two (2) commissioners stated that Plaintiff was not on the same page and that the Executive Leadership Team needed to go, stating the following statements listed below.

   a. "Who does this black guy think he is?" – Commissioner Matt Hubbard and Commissioner Phillip Morris

    b. "We need to get rid of this black guy and the rest of them." – Commissioner Matt Hubbard and Commissioner Phillip Morris

49. On July 23, 2019, Plaintiff reports SHA's discriminatory practices, fraudulent billing practices, and non-compliant procurement practices to HUD and HUD-OIG.

50. On July 25, 2019, Plaintiff and the Executive Leadership Team reports Defendant's discriminatory housing violations to Fair Housing Center of North Alabama, including without limitation.

    a. Defendant used Sylavon Court as elderly and disabled housing, despite HUD's family housing designation.
    b. Defendant used Sylavon Court as elderly and disabled housing to prevent families and African Americans from residing at Sylavon Court.

51. On July 25, 2019, Plaintiff meets with HUD-OIG investigators to discuss mismanagement of federal HUD funding, discrimination, and corruption at SHA.

52. On July 26, 2019, a group of people congregated outside Defendant's building.

53. The group included a local television and radio station, the chief of police, the mayor, the city prosecutor, and city counselors.

54. The group remained in the parking lot and intimidated the employees and members of the Executive Leadership Team.

55. Plaintiff then hired a private security company to provide security at the SHA based upon the threatening behavior and related actions intended to intimidate Plaintiff and the Executive Leadership Team.

56. On or about September 14, 2018, in a conversation with Mueller, Judy Maness, former SHA employee (20+ years) who served in the following capacities simultaneously: (Deputy Director, Finance Director, Human Resources Director, Public Housing Director) hired prior to the Plaintiff becoming hired as ED or CEO of SHA, stated that Plaintiff should be "taken around back and shot."

57. On the same day, Judy Maness stated Mueller should place her children in the local elementary school with less diversity or that was predominantly white.

58. At least the following SHA employees have filed charges of discrimination and/or retaliation with the U.S. Equal Employment Opportunity Commission - Birmingham District Office based on the facts alleged herein.

   a. Chief Executive Officer: Michael C. Threatt (terminated-10/19)
   b. Chief Financial Officer: Heather Mueller (terminated - 11/19)
   c. Chief Housing Officer: Daniell Womack (terminated - 11/19)
   d. Chief Human Resources: Nicole Daniels (terminated 11/19)
   e. Executive Assistant: Jennifer Harris (terminated 11/19)
   f. Resident Engagement Manager: Jerethia Blake (terminated 9/19)
   g. Asset Manager: Beth Jeter (terminated- 1/20)

59. As listed below, Plaintiff has filed three (3) charges of racial discrimination and/or retaliation with the U.S. Equal Employment Opportunity Commission

- Birmingham District Office ("EEOC Office") based on the facts alleged herein.

    i.   July 25, 2019
    ii.   October 22, 2019
    iii.   November 12, 2019

60. Defendants were at least notified by the Plaintiff and the EEOC Office of each of the charges filed above.

61. On or about August 1, 2019, SHA Board of Commissioners approves, Plaintiff's request for FMLA leave due to a medical condition caused by the hostile work environment.

62. On or about August 2, 2019, Plaintiff begins FMLA leave, and the SHA Board is notified.

63. During Plaintiff's absence, the following chain of command was established:

    a. Womack became the Interim Chief Operating Officer;
    b. Mueller became the Interim Chief Financial and Innovation Officer;
    c. Daniels became the Interim Chief Administrative Officer.

64. On August 8, 2019, Womack, on behalf of Plaintiff and the Executive Leadership Team, submitted a letter to the Board/Defendant.

65. The letter was sent via email to Board Commissioner and Chairman Pat Lozito ("Chairman Lozito"), Vice Chair Alma Jean Cook ("Commissioner Cook"), James Adams, Matt Hubbard, and Phillip Morris.

66. The letter stated, in part,

This letter is to inform you [the Board] that we, the SHA Executive Leadership Team, have reported the findings of the forensic audit and fiscal audit to HUD. Also, we have reported discrimination and segregation issues to the Department of Justice and Fair Housing. There will be multiple government agencies over the next several months investigating a variety of issues that SHA Executive Leadership Team has uncovered.

67. As stated in the letter, Plaintiff and the Executive Leadership Team had reported and continued to report fraudulent billing practices to the Board and the federal government.

68. Plaintiff and the Executive Leadership Team had also reported and continued to report Defendant's housing violations to the Board and the federal government.

69. On August 12, 2019, Commissioner Cook responded through her SHA email address, "I have read the memo and letter."

70. On August 12, 2019, the Executive Leadership Team met with Chairman Lozito to discuss the current work environment at SHA and threats against the Plaintiff and Executive Leadership Team.

71. During the meeting, Mueller told Chairman Lozito, "We have to change, or we're going to get in trouble with HUD…We've got to get this stuff cleaned up…it's been clean up from day one…We have to spend [money from HUD] like they tell us, or [HUD] will take it back."

72. Chairman Lozito replied with defiance, deflection and refused to acknowledge the issues presented as valid and further refused to take any corrective action.

73. At the August 16, 2019, Board meeting, the Executive Leadership Team again presents information regarding their attempts to improve Defendant's practices during the previous fiscal year.

74. Mueller informed the Board that, at the direction of and aid of Plaintiff, she cut wasteful spending, streamlined costs, implemented checks and balances, and formulated a Corrective Action Plan with HUD as a result of the fiscal audit findings "from the previous management staff of the SHA" prior to Plaintiff becoming ED or CEO.

75. Mueller also informed the Board that at the direction of Plaintiff, she intended to teach asset managers to read and abide by SHA's budget.

76. Due to the Plaintiff and the Executive Leadership Team, Defendant's revenue increased.

77. During the same Board meeting, Plaintiff informed the Board that Fair Housing and Equal Opportunity (FHEO) had identified SHA as a high risk for segregation.

78. On August 16, 2019, Plaintiff provided comprehensive details to the Board of Plaintiff's and Executive Leadership Team's reports of SHA's

misconduct to Fair Housing Center of North Alabama, HUD, HUD OIG, and DOJ (discrimination, mismanagement of funds, segregation) during the CEO Report.

79. Plaintiff also informed the Board that a meeting between the Birmingham HUD Field Office, the Atlanta Regional offices, the Sylacauga Mayor, the Board, and the Executive Leadership Team would be scheduled for September 2019.

80. The purpose of the September meeting was to continue working with HUD to report Defendant's fraudulent billing practices, mismanagement of federal resources, and the discriminatory actions described herein.

81. On September 4, 2019, Plaintiff notified HUD Field Office that he was on approved intermittent FMLA leave.

82. On September 5, 2019, Defendant SHA placed Plaintiff  and the Executive Leadership Team (Mueller, Womack, Daniels).

83. On or about the same day, Sam Royster was installed as acting-CEO of SHA by the Defendant.

84. Royster's alleged reason for placing Plaintiff and the Executive Leadership Team on leave was to conduct an organization review and audit.

85. However, to date, an audit has not been conducted.

86. On or about September 10, 2019, Plaintiff and the Executive Leadership Team were removed from the Defendant's website and all social media accounts.

87. On September 12, 2019, Royster communicated to Womack, which stated, in part, "[s]uch leave does not constitute disciplinary action and no action has been taken against you."

88. However, Mueller received notice from a third (3rd) party vendor around this time in September, that she had been terminated prior to receiving notice that she had been placed on administrative leave.

89. On September 16, 2019, in an open Board meeting, Royster, acting as CEO, discussed Plaintiff and the Executive Leadership Team being on administrative leave and further discussed Plaintiff's approved FMLA leave.

90. On September 27, 2019, Chairman Lozito and Royster, acting as CEO, met with SHA employees.

91. During the meeting, Chairman Lozito stated, "They [Plaintiff & Executive Leadership Team] ain't never coming back."

92. On or about October 8, 2019, an article was published in *Sylacauga Today*, which identified Plaintiff and the Executive Leadership Team by name, stated they had been placed on administrative leave, and discussed the surrounding circumstances.

93. On October 24, 2019, Defendant terminated Plaintiff.

94. At the time Defendant terminated Plaintiff's employment with SHA, Plaintiff had four (4) more years remaining under the terms of the Employment Agreement.

95. At all times relevant, Mayor Heigl knew or should have known of Plaintiff's employment agreement and business relationship with the Defendant.

96. At all times relevant, Mayor Heigl knew or should have known of the Defendant's misconduct to include at least the following.

   a. Issues with fair housing and segregation;
   b. Mismanagement and misappropriation of federal funds; and
   c. Disparities in the procurement process and the discrimination in the provision of public housing.

97. Without cause or justification, Mayor Heigl contributed to the hostile work environment, culture of discrimination (procurement, provision of public housing) at SHA, or otherwise aided the wrongful acts of the Defendant in at least the following ways.

   a. Frustrated or diminished Plaintiff's ability to exercise contractual rights;
   b. Frustrated or diminished Plaintiff's ability to perform contractual duties;
   c. Frustrated or diminished Plaintiff's ability to exercise constitutional or statutory rights;
   d. Frustrated or diminished Plaintiff's ability to perform constitutional or statutory duties;

98. Mayor Heigl's actions caused Plaintiff to suffer damages and exacerbated the actions of the Defendant.

99. On October 30, 2018, after successfully completing his first year of

employment with SHA, Plaintiff, received a raise, promotion and contract

extension including the following:

    a. Title changed from Executive Director to Chief Executive Officer;
    b. Salary increase $120,000 per annum to $157,000;
    c. Contract extension from One-year term to a Five (5) year term;

100.     During his two-year tenure as ED and CEO of Sylacauga Housing

Authority, Plaintiff, Michael C. Threatt, received numerous awards,

commendations including the following:

    a. 2019 Top Four Winner for Rural Leader Magazine 40 under 40 on September 5, 2019 (from Alabama, Georgia, and Florida);
    b. 2019 Executive Director of the Year awarded on August 21, 2019 by the Alabama Association of Housing and Redevelopment Authorities (AAHRA), the Alabama public housing collaborative for the National Association of Housing and Redevelopment Officials (NAHRO);
    c. 2019 Website of the Year awarded on August 21, 2019 by the Alabama Association of Housing and Redevelopment Authorities (AAHRA), the Alabama public housing collaborative for the National Association of Housing and Redevelopment Officials (NAHRO);
    d. 2019 SHA Evolution Scorecard released on August 15, 2019 that highlights the performance and results of his leadership (e.g., creating checks and balances, updating policies and procedures, and applying effective management practices that increased revenue by $280,000, saved $159,000 in human capital hiring, and increased occupancy to 99% percent);
    e. 2019 Graduate of Leadership Sylacauga on May 14, 2019 sponsored by Sylacauga Chamber of Commerce;
    f. 2018 Inaugural Awardee for the Central Alabama 40 under 40 on July 21, 2018;

**FIRST CLAIM OF RELIEF**
**BREACH OF CONTRACT**
**(SYLACAUGA HOUSING AUTHORITY)**

92. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

93. Plaintiffs' employment with SHA as an Executive Director started in November 2017.

94. At the conclusion of his first year as an employee of the SHA, Plaintiff was given a promotion, raise, and Five (5) year contract extension.

95. On or about October 30, 2018, Plaintiff and Defendant, entered into a written agreement, "Employment Agreement Between The Sylacauga Housing Authority (SHA) and Michael C. Threatt" ("Employment Agreement") in which Plaintiff is referred to as "Employee" and SHA is referred to as "Employer."

96. The Employment Agreement further provides that the plaintiff agreed to serve as the Chief Executive Officer and as Secretary/Treasurer of the Board of Commissioners for the SHA.

97. Plaintiff would provide services regarding his "experience and knowledge of affordable housing management, public housing management, information technology, procurement, maintenance, real estate development, strategic planning, human resources, fiscal operations, nonprofit management, community economic development, resident services, public affairs, and neighborhood revitalization programs of which the Employer is in need;"

98. Defendant was to provide to the Plaintiff remuneration in the sum of one hundred fifty-seven thousand dollars and no cents ($157,000.00) per annum along with other certain benefits and consideration.

99. Per the terms of the Employment Agreement, the "Employee and Employer agree that this term of the contract shall be extended for <u>Five (5)</u> years from the date of this Agreement of Employment."

100.    Per the terms of the Employment Agreement, the Parties intended to include a provision referred to as an "automatic extension clause" which reads as follows:

> Unless notice of termination is given by either party, as hereinafter set forth, there shall be an automatic extension of a one-year term following each annual anniversary of the original one-year term and any extension thereof. To prevent said automatic extension, either the Employee or the Employer shall give written notice of termination of employment and this agreement to the office at least sixty days prior to the annual anniversary of the said agreement. If such notice of termination is given, it will not alter or shorten the then existing term of this Agreement but shall only prohibit the automatic one-year extension. It is the intention of the parties that this provision shall operate as an "automatic extension clause' so that the contract will automatically be extended for one additional year as of each Agreement date and so that the agreement) if not earlier terminated by notice of either party as described herein) shall always have a remaining one-year term. In the event a notice of termination is given as outline above, its effect will be that this Agreement will no longer automatically extend but will expire at the end of the then existing term.

104.     The Employment Agreement further defines the Conditions of

Employment, Compensation, Fringe Benefits, and Travel Budget to be

provided to the Plaintiff by the Defendant.

105.     The Employment Agreement further defines the causes constituting a

sufficient basis for terminating Plaintiff's employment and ending the

Employment Agreement within the section titled "Reasons for Discharge"

which sets for the events authorizing the Defendant to terminate the Plaintiff

prior to the expiration of the term of the Agreement.

      a. "This Agreement shall not be terminated by the Employer during this term except upon a showing of serious or repeated failures on the part of the Employee to comply with Authority policy, or upon a showing that Employee has failed without just cause to comply with any lawful decision or directive of the Employer or for similar just cause."

      b. Just cause is defined "as that which is based upon reasonable grounds and that which must be for fair and honest causes, and as such are regulated by good faith";

      c. The Employee shall be afforded due process and opportunity to present his/her side of any issue, which is purported to be grounds for dismissal for any reason.

106.     The Employment Agreement further provides for severability and

states that "if any provision in this Agreement of Employment is held by a

court of competent jurisdiction to be invalid, void or unreasonable, the

remaining provisions shall nevertheless, continue in full force without being

impaired or invalidated in any way.

107.     As stated herein, the Defendant's breaches of the Employment

Agreement are egregious and numerous. Defendant, SHA, breached the

Employment Agreement with the Plaintiff, in at least the following ways

listed below.

    a. Interfering with Plaintiff's ability to perform his contractual duties and responsibilities pursuant to HUD regulations;

    b. Failing to comply with the "automatic renewal clause";

    c. Failing to provide Plaintiff due process or an opportunity to rebut any reason allegedly supporting termination;

    d. Terminating the Plaintiff's employment without just cause and for illegal purposes;

    e. Failing to provide Plaintiff with proper Notice of Termination and the basis in support of the same;

    f. Failing to provide Plaintiff with accrued benefits after the Termination;

    g. Failing to provide to Plaintiff salary, fringe benefits, and other consideration;

109.    As a result of the Defendants actions, Plaintiff was damaged, thereby

including loss of salary, and other general and compensatory damages in

amounts to be proven at trial.

108.    Plaintiff claims all damages allowable under law.

**SECOND CLAIM FOR RELIEF**
**DISCRIMINATION BASED ON RACE (AFRICAN AMERICAN)**
**in Violation of Title VII of the Civil Rights Act of 1964**
**Sylacauga Housing Authority**

110.    Plaintiff re-alleges and incorporates by reference the preceding

paragraphs as if fully set forth herein.

111.    Defendant engaged in a pattern and practice of unlawful

discrimination on the basis of race or national origin by denying Plaintiff,

salary, contractual salary increases and subjecting him to an arbitrary layoff and discharge on the basis of his race or national origin in violation of Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq.

112.      Defendant SHA at all times relevant hereto had actual and constructive knowledge of the conduct described herein and above.

113.      Defendant SHA failed to take all reasonable steps to prevent the discrimination based on race from occurring. Plaintiff repeatedly filed grievances with the SHA Board of Commissioners, but the SHA failed to take any remedial action or investigatory action. Plaintiff perceived the responses from the SHA or lack thereof as further frustration of the harm caused by the discrimination and retaliation.

114.      Defendant SHA violated Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq., by failing to adequately supervise, control or discipline and/or otherwise penalize the conduct, acts and failures to act of defendant and its Board of Commissioners, agents, staff, and employees as described herein and above.

115.      Plaintiff has filed a charge of discrimination on the basis of race or national origin in employment with EEOC, a true and correct copy has been made a part of the record of this cased and served on the Defendant, SHA, and incorporated herein by reference. Plaintiff has exhausted his

administrative remedies.

    a.  July 25, 2019 – Charge No. 420-2019-02953
    b.  October 22, 2019 – Charge No. 420-2020-00184
    c.  November 12, 2019 – Charge No. 420-2020-00363

116.     As a direct and proximate result of defendants' actions and inactions, plaintiff has suffered and will continue to suffer lost wages, pain, suffering, and extreme and severe mental anguish and emotional distress; he has incurred and will continue incur medical expenses for treatment by psychotherapists and or other health professionals and for other incidental expenses, and he has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

117.     As a further direct and proximate result of defendants' violations of Title VII plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship with defendant and has thereby incurred and will continue to incur, legal fees and costs. Plaintiff requests that attorney's fees be awarded pursuant to Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq..

118.     Plaintiff is informed and believes and based thereon alleges that the outrageous conduct of Defendant described above was malicious and

oppressive, and done with conscious disregard of plaintiff's rights, and with the intent to injure plaintiff. For at least these reasons, Plaintiff is entitled to all damages allowable under law from Defendant.

119.    Because defendant acted with malice and willful disregard for plaintiff's rights, plaintiff is entitled to punitive damages from defendant SHA.

### THIRD CLAIM FOR RELIEF
### RETALIATION
### (Violation of Title VII of the Civil Rights Act of 1964)
### Sylacauga Housing Authority

121.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

122.    The Plaintiff engaged in activities which are protected under Title VII.

123.    By complaining to the SHA Board of Commissioners as evidenced by Board meeting minutes and email messages and then filing three charges with the EEOC (July 25, 2019; October 22, 2019; November 12, 2019) Plaintiff exercised his right to be free of race-based discrimination.

124.    Plaintiff has made numerous and ongoing reports of discrimination based on race. Those reports culminated with formal EEOC complaints as alleged herein, but Threatt consistently advised SHA Board of Commissioner, EEOC employees, HUD employees, and other SHA employees of the discriminatory treatment and hostile work environment.

125.   The Defendant, SHA, was aware of each of the activities under Title VII.

126.   Defendant, SHA, retaliated against Plaintiff without limitation, as follows

   a. Interfering with the day-to-day functions of the SHA;
   b. Interfering with Plaintiff's job duties;
   c. Creating and fostering a hostile work environment;
   d. Publishing Plaintiff's confidential and sensitive employment information and medical information;
   e. Placing plaintiff on administrative leave;
   f. Terminating plaintiff's employment with SHA.

127.   As a direct and proximate result of the protected activity, the Plaintiff suffered adverse employment actions, including without limitation administrative leave, loss of pay, loss of benefits, damage to professional reputation, termination, and loss of earning capacity.

128.   The retaliatory actions were taken by Defendant.

129.   The retaliatory actions created an intolerable hostile work environment, and ultimately a termination of employment.

130.   The Defendant SHA at all relevant times, knew or should have known, of the retaliatory actions being taken against the Plaintiff.

131.   Because of the willful actions of the Defendant SHA, and agents, employees, representatives of SHA, and as a proximate cause thereof, the Plaintiff has been and continues to be denied his right to equal employment

opportunity in violation of the Civil Rights Act of 1964 as amended, 42

U.S.C. § 2000e et seq..

132.     As a direct and proximate result of the unlawful actions of Defendant

SHA as herein alleged, Plaintiff has suffered psychological, emotional,

anguish, embarrassment, and distress, and loss of enjoyment of life, thereby,

entitling Plaintiff to compensatory damages.

133.     As a result of the foregoing, the Plaintiff has been damaged. Such

damages include, but are not limited to discipline, including termination

from employment, suspension from employment, loss of pay, loss of

benefits, loss of an amicable work environment, and harm to his

professional reputation.

134.     The actions of Defendant SHA, as herein alleged, were willful, wanton,

and carried out with deliberate disregard for the rights of Plaintiff, by

Defendant thereby entitling Plaintiff to an award of punitive damages.

**FOURTH CLAIM FOR RELIEF**
**RETALIATION IN VIOLATION OF THE FAIR HOUSING ACT (FHA) –**
**Sylacauga Housing Authority**

135.     Plaintiff re-alleges and incorporates by reference the preceding

paragraphs as if fully set forth herein.

136.     The FHA and Affirmatively Furthering Fair Housing (AFFH) prohibit
retaliation against any person for exercising rights granted or protected by
the acts, or for encouraging others to exercise their rights under the acts. *See*
42 U.S.C. § 3617; Ala. Code 1975 § 24-8-8. "To state a claim for retaliatory
housing discrimination, a plaintiff must assert that a defendant coerced,

intimidated, threatened, or interfered with his exercise of rights granted under the FHA or [AFHA]." *Philippeaux v. Apartment Inv. and Mgmt. Co.*, 598 Fed. Appx. 640, 644 (11th Cir. 2015) (citing 42 U.S.C. § 3617 and *Dixon v. Hallmark Co.*, 627 F.3d 849, 858 (11th Cir. 2010)). Additionally, "'[t]o establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action.'" *Philippeaux*, 598 Fed. Appx. at 644 (quoting *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001)). Close temporal proximity between [Plaintiff's] alleged protected activity and the alleged retaliatory activity establishes a causal link between the two events, [especially when] the proximity [is] very close. *Fisher v. SP One, Ltd.*, 559 Fed. Appx. 873, 877-78 (11th Cir. 2014)

137.     Plaintiff specifically reported to the Board that the Defendant was engaging in unlawful housing practices that resulted in discrimination and segregation.

138.     Plaintiff continued to report the unlawful housing practices to the Board.

139.     Plaintiff specifically reported to the HUD, Fair Housing Center of N. AL, Alabama NAACP, HUD-OIG, and the DOJ, that the Defendant was engaging in unlawful housing practices that resulted in discrimination and segregation.

140.     Defendant was aware that the HUD Field Office and Fair Housing and Equal Opportunity (FHEO) had identified the SHA as a high-risk for segregation.

141.     On August 8, 2019, Plaintiff and the Executive Leadership Team

informed the Board that they had "reported discrimination and segregation issues to the "Department of Justice and Fair Housing."

142.    On August 16, 2019, Plaintiff provided comprehensive details to the Board of Plaintiff's and Executive Leadership Team's reports of SHA's misconduct (discrimination, mismanagement of funds, segregation) during the CEO Report.

143.    Plaintiff and the Executive Leadership Team reported discriminatory housing practices to Fair Housing, including the use of Sylavon Court as elderly and disabled housing, despite HUD's family housing designation.

144.    Defendant used Sylavon Court as elderly and disabled housing to prevent families and African Americans from residing at Sylavon Court.

145.    Plaintiff was placed on administrative leave less than one (1) month after submitting the letter to the Board and after providing the CEO Report to the Board.

146.    Plaintiff was terminated within three (3) months after submitting the letter to the Board and after providing the CEO Report to the Board.

147.    Defendant terminated Plaintiff's employment in retaliation for opposing and reporting Defendant's Fair Housing violations.

148.    Plaintiff claims all damages allowable under law.

## FIFTH CLAIM FOR RELIEF
## THE FALSE CLAIMS ACT

## FALSE CLAIMS ACT RETALIATION
### Sylacauga Housing Authority

148.    Plaintiff re-alleges and incorporates by reference the preceding

paragraphs as if fully set forth herein.

149.    Plaintiff opposed what he believed to be Defendant's fraudulent

billing practices.

150.    Plaintiff specifically reported what he believed to be fraudulent billing

practices to the Board.

151.    Plaintiff continued to report fraudulent billing practices to the Board

and HUD.

152.    In October 2018, due to the discovery of "dubious" transactions,

Plaintiff asked the Board to approve a vendor to conduct a fiscal audit.

153.    In February 2019, the audit results were presented to the Board.

154.    Plaintiff and Executive Leadership Team informed the Board that the

audit revealed improper spending and a lack of documentation.

155.    At the June 21, 2019 Board meeting, Plaintiff and Executive

Leadership Team informed the Board of their efforts to correct Defendant's

fraudulent billing practices.

156.    On August 8, 2019, Plaintiff and Executive Leadership Team

informed the Board via letter that they had "reported the findings of the

forensic audit and fiscal audit to HUD."

157.     On August 16, 2019, Plaintiff provided a comprehensive CEO report
to the Board and them that the fraudulent billing needed to be corrected.

158.     At the August 16, 2019 Board meeting, Plaintiff again informed the
Board of the efforts to correct Defendant's practices.

159.     As a result of Plaintiff's complaints and efforts, on September 5,
2019, Defendant placed Plaintiffs on administrative leave.

160.     Plaintiff was placed on administrative leave less than one (1) month
after submitting the letter to the Board and providing comprehensive CEO
report to the Board.

161.     Plaintiff was placed on administrative leave less than three (3) weeks
after again informing the Board of their efforts to correct Defendant's
fraudulent billing practices and CEO Threatt's report of the executive
leadership team's plan to meet with the Board and HUD in September.

162.     On October 24, 2019, one (1) month after placing Plaintiff on
administrative leave, Defendant terminated Plaintiffs' employment.

163.     Defendant terminated Plaintiff's employment in retaliation for
opposing and reporting Defendant's fraudulent billing practices.

164.     Plaintiff claims all damages allowable under law.

### PRAYER FOR RELIEF

**NOW WHEREFORE**, Plaintiff respectfully prays this court

1. For a money judgment against Defendant for the violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-5(g), representing lost benefits of employment and compensatory damages, including but not limited to limited earning capacity, loss of status, damage to reputation, emotional distress, and inconvenience, for an amount to be determined at the trial of the action.

2. Order Defendant to make Plaintiff whole by providing appropriate back pay and reimbursement for lost wages, Social Security, front pay and other benefits in an amount to be shown at trial, including but not limited to, affirmative relief that puts Plaintiff in the position he would have been had there been no discrimination or retaliation.

3. Grant to Plaintiff judgment against Defendant for damages, in an amount to be determined by a jury for mental distress and inconvenience imposed on him through and as a result of the aforementioned discriminatory acts;

4. The court enters a permanent injunction enjoining Defendant from discriminating against employees based on race or age and/or from retaliating against individuals who seek to be free from discrimination.

5. That the costs of this action, including an award of any attorney fees, should they arise, be taxed to Defendant;

6. Interest on all monies owed;

7. Grant Plaintiff a jury trial; and

8. Grant such additional relief as the court deems proper and just.


Respectfully submitted this 20th day of January 2020.

**The Rice Firm, LLC**

<u>s/Richard A. Rice</u>

_____

Richard A. Rice, *Esq*.
(ASB-8387-I66R)
Attorney for Michael C. Threatt
The Rice Firm, LLC
N. 420 20th Street
Birmingham, Alabama
35203 Suite 2200
<u>rrice@rice-lawfirm.com</u>
F. 888.391.7193
O. 205.618.8733




**JURY DEMAND**




Defendant may be served at:                    Courtesy Copy Provided:

Sylacauga Housing Authority                    Attention: Hon. Mayor Jim Heigl
c/o Board of Commissioners                     City of Sylacauga
c/o Sam Royster                                301 North Broadway Avenue.,
415 West 8th Street,                Sylacauga Al 35150
Sylacauga, AL 35150