IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| Michael C. Threatt, | |
| **Plaintiff,** | |
| v. | |
| Sylacauga Housing Authority, Commissioners James Adams, Alma Jean Cook, Matt Hubbard, Patrick Lozito, Phillip Morris, and Mayor of Sylacauga Jim Heigl, | Civil Action No. 20-CV-00096-ACA |
| **Defendants.** | |

SHA DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISQUALIFY RICHARD
RICE AS COUNSEL FOR PLAINTIFF AND INQUIRE WHETHER PLAINTIFF'S
OTHER COUNSEL OBTAINED SHA PRIVILEGED OR CONFIDENTIAL
INFORMATION FROM RICE AND THUS ALSO SHOULD BE DISQUALIFIED

Defendants Sylacauga Housing Authority ("SHA"), and Commissioners

Patrick Lozito, James Adams, Matt Hubbart, Phillip Morris, and Alma Jean Cook

(collectively "Movants" or "SHA Defendants"), submit this Brief in Support of their

Motion to Disqualify Richard Rice as Counsel for Plaintiff and to determine whether

Plaintiff's other counsel should also be disqualified.

# I.   **INTRODUCTION**

Plaintiff's attorney Richard Rice previously had an attorney-client relationship with Defendant SHA in which he represented SHA regarding assessing SHA's "civil rights" matters, which are matters substantially related to the "civil rights" claims Rice asserts here on behalf of Plaintiff Threatt against his former client SHA. This violates the former client conflict rule of the Alabama Rules of Professional Conduct – Rule 1.9. Given that SHA does not have any document or other indication attorney Rice ever terminated his former attorney-client relationship with SHA, this also violates the current client conflict rule of the Alabama Rules of Professional Conduct – Rule 1.7. Either such violation warrants Rice's disqualification from representing Plaintiff Threatt in this action against SHA and the individual Defendants, who are members of SHA's Board of Commissions, which is SHA's governing body.

Rice's violations of these ethical rules may also implicate Plaintiff Threatt's other two attorneys in this action – Rod Cook and Lee Winston – and SHA Defendants request the Court inquire into such implication. In the alternative, SHA Defendants request this Court to apply the Eleventh Circuit's approach to such inquiries and irrebuttably presume Rice's violations implicate Cook and Winston and thereby similarly disqualify them too.

SHA Defendants have not consented and do not consent to the conflicts of Plaintiff's counsel, arising from Richard Rice's "switching sides."

Defendants counsel might be remiss if they did not note they are ethically obligated to raise these ethical issues with a tribunal that has authority to address them, *see* Ala. R. Prof. Con. 8.3, which are the State Bar or this Court. SHA Defendants' counsel choose to raise these issues with this Court, which is the tribunal in which defense counsel believes these issues will be most quickly and efficiently resolved. Obviously, these ethical issues are best resolved sooner than later.

## II.   STATEMENT OF FACTS

The facts, as demonstrated by the supporting exhibits submitted with Movants' evidentiary submission, establish SHA via Plaintiff (while Plaintiff was still SHA's CEO) engaged Rice as SHA's "civil rights" attorney and Rice has now, in effect, "switched sides" to represent Threatt in connection with this "civil rights" lawsuit against SHA (and members of its Board of Commissioners).

1.      In early March of 2019, Plaintiff, in his capacity as CEO of SHA, met with attorneys Richard Rice and April Collins regarding, among other things, Rice's providing a "civil rights" assessment of and for SHA. Doc. 56-1.

2.      On March 19, 2019, SHA via Threatt as SHA's CEO forwarded a draft scope of work for Fair Housing and Civil Rights Assessment to Attorneys Rice and Collins.  Doc. 56-2.

3.      On March 21, 2019, both Rice and Collins separately expressed concerns over the scope of work and budget for same, and SHA via Threatt as SHA's CEO agreed the work should be approached from a "cost-effective perspective that should include an assessment, plan, and training for both Fair Housing and Civil Rights," and asked Rice and Collins if they would be able to "perform this work for the SHA."  Doc. 56-2.

4.      The same day, Rice stated he would be able to perform the work he had discussed with Threatt on their tour of Sylacauga.  Doc. 56-2.

5.      On May 29, 2019, Plaintiff sent an e-mail to the other members of (what Threatt referred to as) "SHA's Executive Leadership Team"[1] with the subject "Second Round of Assessments" identifying the Rice Law Firm as the firm who would be conducting SHA's "Civil Rights" Assessment. Doc. 56-3.

6.      On June 17, 2019, Plaintiff sent the other members of "SHA's Executive Leadership Team" another e-mail with an updated list of SHA's

---

[1] Doc. 1 at ¶22.

employees, vacant positions, Board of Commissioners, and attorneys, again identifying Richard Rice as SHA's "Civil Rights" Attorney. Doc. 56-4.

7. On July 6, 2019, Plaintiff sent the other members of "SHA's Executive Leadership Team" yet another e-mail with another updated list, again identifying Richard Rice as SHA's "Civil Rights" Attorney, and stating the fee ($10,000) for the "Civil Rights" Assessment the Rice Law Firm would perform for SHA. Doc. 56-5.

8. On July 15, 2019, Plaintiff sent the other members of "SHA's Executive Leadership Team" another e-mail entitled "Workforce" with the "lean and mean list," again identifying Richard Rice as SHA's "Civil Rights" Attorney, and again, stating the cost of the "Civil Rights" Assessment the Rice Firm was engaged to perform. Doc. 56-6.

9. On August 1, 2019, Richard Rice sent an e-mail to Plaintiff regarding "ground-breaking litigation" employing the "federal False Claims Act ("FCA") to enforce a County's obligation to 'affirmatively further fair housing,'" which Threatt forwarded to the other members of "SHA's Executive Leadership Team." Doc. 56-7.

10. The above-described communications and documents, considered individually or together, demonstrate SHA via Threatt as SHA's CEO considered Richard Rice to be SHA's "Civil Rights" Attorney.

11.     Notwithstanding that Rice was SHA's "Civil Rights" Attorney, and apparently without termination his representation of SHA as its "Civil Rights" attorney, Rice sent a letter to each of SHA's Board Commissioners dated September 4, 2020, stating Rice's firm represented Michael Threatt, individually, against SHA. Doc. 56-8.

12.     Thereafter, and in this action, Rice signed and filed Plaintiff's original Complaint against SHA, alleging various violations of Plaintiff's "civil rights." The phrase "civil rights" is mentioned in the original Complaint no less than ten (10) times. *See* Doc. 1.

13.     Plaintiff's Amended Complaint also alleges various violations of Plaintiff's "civil rights," and the phrase "civil rights" is mentioned in the Amended Complaint no less than fourteen (14) times.  *See* Doc. 31.  Amended Complaint Counts "A" through "C" all assert civil rights claims against SHA.  Although Rice did not sign the Amended Complaint, the factual allegations in the Amended Complaint are substantially similar, and in many instances, identical to those of the original Complaint, and Rice is listed as counsel for Plaintiff in the Amended Complaint as well as all other documents Plaintiff filed in this case.

14.     Plaintiff's Amended Complaint also asserts a claim under the FCA, *see* Doc. 31 Count "D" ¶¶141-156, and Rice had advised SHA via Threatt as SHA's CEO about a claim under the FCA in Rice's earlier e-mail to Plaintiff.  See ¶9, above.

15.    The foregoing demonstrates attorney Rice previously had an attorney-client relationship with SHA as its "civil rights' attorney, and regarding FCA matters, but now has switched sides to represent Plaintiff on "civil rights" and FCA claims against his former client SHA.

### III.    STANDARD OF REVIEW

"Motions to disqualify are governed by two sources of authority." *Herrmann v. Gutterguard Inc.*, 199 Fed. App'x 745, 752 (11th Cir. 2006) (per curiam).  "First, attorneys are bound by the local rules of the court in which they appear." *Id*.  The Local Rules, the Alabama Rules of Professional Conduct, and the American Bar Association Model Rules of Professional Conduct[2] ("the Rules") govern the professional conduct of attorneys in litigation in the United States District Court for the Northern District of Alabama. N.D.AL., Local Rule 83.1(f).  Second, "federal common law also governs attorneys' professional conduct because motions to disqualify are substantive motions affecting the rights of the parties." *Herrmann*, 199 Fed. App'x at 752.

Also, the Eleventh Circuit has stated:

> "[T]he court may not simply rely on a general inherent power to admit and suspend attorneys, without any limit on such power." *Schlumberger* [*Techs., Inc. v. Wiley*], 113 F.3d [1553] at 1561 [(11th Cir. 1997)]. Instead, "[t]he court must clearly identify a specific Rule

---

[2] The American Bar Association Model Rules of Professional Conduct govern "to the extent not inconsistent with the" Local Rules and the Alabama Rules of Professional Conduct.  N.D.AL. Local Rule 83.1(f).

of Professional Conduct which is applicable to the relevant jurisdiction and must conclude that the attorney violated that rule." *Id.*

The party bringing the motion to disqualify bears the burden of proving the grounds for disqualification. *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir.2003). "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if 'compelling reasons' exist." *Id.* A disqualification order "is a harsh sanction, often working substantial hardship on the client" and should therefore "be resorted to sparingly." *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n.4 (11th Cir. 1982). A motion to disqualify brought by opposing counsel "should be viewed with caution . . . for it can be misused as a technique of harassment." Ga. Rules of Prof'l Conduct, R. 1.7, cmt. 15.

*Herrmann*, 199 Fed. Appx. at 752; *see also* Ala. R. Prof. Cond. 1.7 cmt. *Conflict Charged by an Opposing Party*; *see generally Herrmann*, 199 F. App'x at 752 (citing with approval identical language from the comments to the Georgia Rules of Professional Responsibility).

## IV.   APPLICABLE RULES

1.      The Local Rules for the Northern District of Alabama include "Standards for Professional Conduct," and provide attorneys appearing before the Court are governed by the Local Rules, the Alabama Rules of Professional Conduct, and the American Bar Association Model Rules of Professional Conduct.  N.D.AL Local Rule 83.1(f).

2.      Any violations of the standards and Rules "shall constitute misconduct, whether or not occurring in the course of an attorney-client relationship, and shall be  grounds  for  discipline,"  consisting  of  "disbarment,  suspension,  censure,

reprimand, removal from a particular case, … monetary sanctions, or any other

sanction the court may deem appropriate." *Id.*

### A.      <u>Former Client Conflict</u>

3.      Alabama Rules of Professional Conduct 1.9[3] provides, in pertinent part:

A lawyer who has formerly represented a client in a matter shall not
thereafter:

(a) Represent another person in the same or a substantially related
matter in which that person's interests are materially adverse to the
interests of the former client, unless the former client consents after
consultation; or

(b) Use information relating to the representation to the disadvantage
of the former client except as Rule 1.6 or Rule 3.3 would permit or
require with respect to a client or when the information has become
generally known.

4.      The ABA Model Rules of Professional Conduct 1.9 similarly provides,

in pertinent part:

(a) A lawyer who has formerly represented a client in a matter shall not
thereafter represent another person in the same or a substantially related
matter in which that person's interests are materially adverse to the
interests of the former client unless the former client gives informed
consent, confirmed in writing.

…

---

[3] SHA includes both the former client conflict (Rule 1.9) and the current client conflict (Rule 1.7)
Rules because SHA has no record that Rice terminated his representation of SHA, either prior to
his initial correspondence to SHA on behalf of Threatt, individually, or at any time thereafter.
SHA does not know at what point Rice "switched sides," but the determination of the date on
which that happened is not necessary for a determination of the matters presented herein.
Regardless of whether SHA is a current or former client of Rice, his adverse representation of
Threatt against SHA on civil rights matters and other subjects substantially related to his prior
representation of SHA warrant disqualification, and other relief as the Court deems appropriate.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

**B.    Rice's Former Client Was The Organizational Defendant SHA, Not Threatt Individually**

5.    Alabama Rules of Professional Conduct 1.13 provides, in pertinent part:

(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

…

(d) in dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

(e) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.

6.    The ABA's Model Rules of Professional Conduct 1.13, similarly provides, in pertinent part:

(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

…

(f) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

(g) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.

## C.     **Current Client Conflict**

7.      Alabama Rules of Professional Conduct 1.7 provides, in pertinent part:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

   (1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

   (2) Each client consents after consultation.

8.      ABA's Model Rules of Professional Conduct 1.7 provides, in pertinent part:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

   (1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

## V. <u>ARGUMENT</u>

## A. <u>The Attorney-Client Relationship Between SHA and Rice</u>

The first step in the disqualification analysis is answering the question whether an attorney-client relationship existed between Richard Rice and SHA, which is easily answered affirmatively. The Eleventh Circuit has stated:

"To create an attorney-client relationship, there must be an employment contract 'either express or implied' between an attorney and 'the party for whom he purports to act or someone authorized to represent such party.' " *Bryant v. Robledo*, 938 So.2d 413, 418 (Ala.Civ.App.2005) (*quoting Bd. of Comm'rs of the Ala. State Bar v. Jones*, 291 Ala. 371, 281 So.2d 267, 273 (1973)). In this context, the perception and intent of the putative client as to the formation of that contract is particularly relevant. *E.g., Green v. Montgomery Cnty.*, Ala., 784 F.Supp. 841, 845–46 (M.D.Ala.1992) ("[T]he test for determining the existence of [an attorney-client] relationship is a subjective one and 'hinges upon the

client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice.' " (*quoting Westinghouse Elec. Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir.1978))).

*Mississippi Valley Title Ins. Co. v. Thompson*, 802 F.3d 1248, 1253–54 (11th Cir. 2015).

The Middle District, in *Green*, as quoted above by the Eleventh Circuit in

*Thompson*, analyzed the general rule for answering the question, noting:

> This question implicates a small, but growing, body of law and commentary which has attempted to address the circumstances under which an initial consultation between a prospective client and an attorney could be viewed as having developed into an attorney-client relationship.

> The emerging general rule is that "The fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result." *Westinghouse Electric Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978). The mere existence of an express contract of employment, or the payment of legal fees, or the length of the consultation is not determinative of whether a preliminary consultation has matured into an attorney-client relationship. *Derrickson v. Derrickson*, 541 A.2d 149, 153 (D.C.1988); *Foulke v. Knuck*, 162 Ariz. 517, 784 P.2d 723, 726 (Ct.App.1989); *Herbes v. Graham*, 180 Ill.App.3d 692, 129 Ill.Dec. 480, 483–84, 536 N.E.2d 164, 167–68 (1989); *Hughes v. Paine, Webber, Jackson and Curtis*, 565 F.Supp. 663, 669–70 (N.D.Ill.1983). Rather, the test for determining the existence of this fiduciary relationship is a **subjective one and "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention is to seek professional legal advice.**" *Westinghouse Electric Corp.*, 580 F.2d at 1319, *quoting* McCormick on Evidence § 88 (2d ed. 1972) at 179. This subjective belief must, however, be a reasonable one. If, for example, the attorney has made it clear to the would-be client that there is no attorney-client

relationship and if the evidence further reflects that the would-be client should have known that the relationship had not advanced to the point at which it could be deemed a representation, then there would be no attorney-client relationship despite the would-be client's subjective belief. Developments in the Law—Conflicts of Interest in the Legal Profession, 94 Harv.L.Rev. 1244, 1322–23 (1981).

There are two basic rationales for this rule. The first is that the lawyer is in the best position to develop mechanisms to avoid ethical dilemmas, that is, conflicts with potential as well as existing clients. He is the "repeat player," the one who will continually face this problem; he "set[s] the tone for an initial meeting or contact with an individual," Perschbacher & Perschbacher, Enter at Your Own Risk: The Initial Consultation & Conflicts of Interest, 3 Geo.J.Legal Ethics 689, 704–05 (Part II.B) (1990); he knows the ethical rules; and he has the legal background enabling him to anticipate the possible scenarios. *Id.* Therefore, because he "has the ability to avoid the impropriety, it is appropriate that consequences follow when a lawyer fails to exercise that ability—whether through ignorance, negligence, or deviousness." *Id.*

*Green v. Montgomery Cty., Ala.*, 784 F. Supp. 841, 845–46 (M.D. Ala. 1992) (emphasis added).

As the facts demonstrate, here, the relationship between Rice and SHA went beyond an initial consultation. After the initial meeting in March of 2019, which included a tour of some of SHA's facilities and Sylacauga, to discuss the scope of work to be performed for SHA in connection with a Fair Housing and Civil Rights Assessment, Threatt sent attorneys Collins and Rice a draft scope of work for the assessments. Both Collins and Rice raised concerns about the "breadth of the scope of work and the limited resources (time and budget) devoted to this undertaking." Doc. 56-3. Threatt responded that he agreed with the "cost-effective perspective that

should include an assessment, plan, and training for both Fair Housing and Civil Rights," and asked if Collins and Rice if they could "perform this work **for the SHA**." *Id*. (Emphasis added). In response, on March 21, 2019, Rice confirmed with Threatt he "would be able to perform the work we discussed on our tour of Sylacauga." *Id*.

This distinction by Threatt that the work was to be performed "for the SHA" is important, as SHA is an organization and Alabama and Model Rule 1.13 provides specific requirements for representing organizations. Although an organization acts by and through its constituents, the attorney is required to explain to constituents that the organization is the client, when the organization's interests are adverse to the constituent's. *See* Ala. R. Prof. C. 1.13(d); ABA Model Rule 1.13(f).

From the initial meeting through at least July 15, 2019, Threatt's communications to the other members of "SHA's Executive Leadership Team," as well as SHA's organizational documents, repeatedly identified Rice as SHA's "Civil Rights" attorney, and on August 1, 2019, Rice sent Threatt information about Fair Housing/Civil Rights litigation, which Threatt forwarded to the other members of "SHA's Executive Leadership Team." See Doc. 56-1, -4, -5, -6, and -7.

These facts more than meet the test for determining the existence of the requisite attorney-client relationship between SHA and Rice regarding "civil rights" matters and also FCA matters in the context of fair housing, which **"hinges upon**

**the client's belief that [the client] is consulting a lawyer in that capacity and his**

**manifested intention is to seek professional legal advice**." *Green*, 784 F. Supp. at

845-46.  Thus, Threatt cannot dispute that SHA subjectively and reasonably believed

Rice was its "civil rights" attorney and that they had an attorney-client relationship

about "civil rights" matters.

**B.**     **The Matters Covered By The Previous Attorney-Client Relationship Rice
Had With SHA Are Substantially Related To The Claims Threatt Asserts
In This Case Against SHA**

Once an attorney-client relationship is established, the second step in the

disqualification analysis is determining whether the subject matter of the

representation is "substantially related."

The Alabama Supreme Court, relying, in part, on a decision by the Former

Fifth Circuit,[4] has stated:

> In *Ex parte Taylor Coal Co.*, [401 So. 2d 1 (Ala. 1981),] *supra*, this
> Court adopted the "substantial relationship" test for determining
> whether an attorney's prior representation of a client is grounds for his
> disqualification from representing a party against the former client.  If
> the former client wishes to have the attorney disqualified, he need show
> only that the matters or the causes of action involved in the pending
> action are substantially related to the matters or causes of action of the
> prior representation.

…

---

[4] The Eleventh Circuit has held: "the decisions of the United States Court of Appeals for the Fifth
Circuit (the "former Fifth" or the "old Fifth"), as that court existed on September 30, 1981, handed
down by that court prior to the close of business on that date, shall be binding as precedent in the
Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." *Bonner
v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

"Only when the moving party delineates with specificity the subject matters, issues, and causes of action presented in former representation can the district court determine if the substantial relationship test has been met. Merely pointing to a superficial resemblance between the present and prior representations will not substitute for the careful comparison demanded by our cases."

*Ex parte State Farm Mut. Auto. Ins. Co.*, 469 So. 2d 574, 575-76 (Ala. 1985)

(emphasis added), *quoting Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

646 F.2d 1020, 1029 (5th Cir. June 1, 1981).

The Eleventh Circuit has also held:

"The focus of the district court's inquiry should be on the precise nature of the relationship between the present and former representations." *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1029 (5th Cir. Unit B 1981). The court can only determine if the substantial relationship test has been met "when the moving party delineates with specificity the subject matters, issues, and causes of action presented in former representation." *Cox v. Am. Cast Iron Pipe Co.*, 847 F.2d 725, 730 (11th Cir.1988) (*quoting Duncan*, 646 F.2d at 1029) (internal quotation marks omitted). The moving party has to show more than the mere fact that as a result of a former representation, the attorney has knowledge of the moving party's practices and procedures. *Duncan*, 646 F.2d at 1032. The moving party must demonstrate that the attorney "has knowledge of the particular practices and procedures which are the subject matter of [the] suit." Id.

*Herrmann*, 199 F. App'x at 752–53.

In connection with Rice's prior representation of SHA, Threatt/SHA met with

Rice and Collins to discuss their performing a Fair Housing and Civil Rights

Assessment of and for SHA, with Collins to assess the former, and Rice to assess

SHA's "civil rights" issues. SHA's records indicate the Fair Housing aspect of the

Assessment would be primarily performed by Collins, and the Civil Rights Assessment would be primarily performed by Rice.

SHA has not uncovered any additional documents outlining the specifics of the discussions referenced in Threatt's and Rice's e-mail communications, however, the draft scope of work contemplates analysis of racial concentrations and disparities (if any), which is substantially related to Count C in Threatt's Amended Complaint, which complains of retaliation for allegedly reporting to the Board of Commissioners that SHA was "engaging in unlawful housing practices that resulted in discrimination and segregation" and reporting "discriminatory housing practices." Doc. 31 ¶¶ 128-139.

Additionally, Rice's August 1, 2019 e-mail concerned litigation involving a False Claims Act ("FCA") case related to misappropriation of federal funds connected with obligations to "affirmatively further fair housing," combining FCA remedies with those traditionally used in housing desegregation litigation, which is an e-mail Threatt shared with the other members of "SHA's Executive Leadership Team." That is substantially related to Count D in the Amended Complaint, which complains of retaliation under the False Claims Act for reporting SHA for allegedly engaging in "fraudulent billing," by allegedly misappropriating federal funds. Doc. 31 ¶¶ 141-155.

SHA, via Threatt its then CEO, unquestionably considered Rice as SHA's "civil rights" attorney. That is how Threatt as SHA's CEO identified Rice to other members of "SHA's Executive Leadership Team" at least three times. *See* Statement of Fact ¶¶ 6, 7, 8 *supra* at pp. 4-5. As repeatedly described by Threat as SHA's then CEO, the scope of Rice's representation was "civil rights" without limitation. The scope of work of the "civil rights" assessment Rice agreed to perform for SHA certainly included[5] (and thus substantially related to) civil rights claims like those Rice asserts against SHA on behalf of Threatt. Particularly Threatt's claim that he was retaliated against for reporting discrimination on the basis of race in housing.

The Eleventh Circuit has imposed a presumption that all confidences related to the subjects of representation are divulged to the attorney:

> The rule of law in this circuit is (and will continue to be) that "once the former client [petitioner] proves that the subject matters of the present and prior representations are 'substantially related,' the court will irrebutably [sic] presume that relevant confidential information was disclosed during the former period of representation." *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1028 (5th Cir.1981), *cert. denied*, 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981). … [U]pon a showing of substantial relatedness, we presume that the former client [] divulged to the lawyer [] all of his or her confidences relevant to the subject of the representation.

*Freund v. Butterworth*, 165 F.3d 839, 859–60 (11th Cir. 1999). Therefore, this Court

---

[5] Part of the Scope of Work for the Assessment required "Assessment of fair housing issues and contributing factors" Doc. 56-2 at p.6; and "identify fair housing issues and contributing factors, prioritizing those factors that limit or deny fair housing choice of access to opportunity, negatively impact fair housing, or violate civil rights compliance." Doc. 56-2 at p.8.

must presume Rice obtained all SHA's confidences regarding fair housing, civil rights, racial concentrations and disparities (if any), and appropriation of federal funds as to the FCA during his prior representation of SHA.

Rice's initial notice to SHA of his representation of Threatt, mentioned Threatt's conduct as SHA's CEO, including allegedly raising "multiple concerns about racial discrimination, misappropriation of funds, and retaliation" in connection with these concerns. Doc. 56-8. All of these subjects are substantially related to Rice's prior representation of SHA.

Threatt's original and Amended Complaints both allege that Threatt was terminated, in violation of the Fair Housing Act ("FHA") for Threatt's reporting SHA's alleged fair housing violations. Doc. 1 at ¶3, ¶¶135-147; Doc. 31 at ¶¶141-155. The original and Amended Complaints also allege, among other things:

- Threatt identified issues with alleged "discrimination in the provision of public housing," Doc. 1 at ¶37(a); Doc. 31 at ¶43;

- that SHA was allegedly "engaging in unlawful housing practices that resulted in discrimination and segregation," Doc. 1 at ¶ 137; Doc. 31 at ¶129; and

- that Threatt allegedly opposed and reported what he believed to be SHA's fraudulent billing practices, for which he allegedly suffered

retaliation in violation of the FCA, Doc. 1 at ¶¶149-163; Doc. 31 at ¶141-155.

Based on SHA's prior communications with Rice (via Threatt) and the allegation in the original and Amended Complaint, it is quite clear the subjects of the current litigation are substantially related to the subjects of Rice's prior representation of SHA. As such, Rice's representation of Threatt, individually, against SHA and its Board of Commissioners on substantially related subjects violates the Local Rules, the Alabama Rules of Professional Conduct, and the ABA's Model Rules. This requires Rice's disqualification as Threatt's counsel in this action.

Defendants also submit this requires further relief, including an Order that requires Rice to disclose to SHA and this Court all information about SHA that Rice shared with Threatt's other two attorneys of record, and produce all documents that reflect or relate to the sharing of such information.

In the alternative to that order, and consistent with the Eleventh Circuit's irrebuttable presumption in *Freund v. Butterworth*, Defendants submit this Court should "irrebutably [sic] presume that relevant confidential information was disclosed," 165 F.3d at 859–60, by Rice to Plaintiffs' other two attorneys, which should disqualify them too. Their disqualification, too, because an attorney cannot ethically do indirectly through another what the attorney is ethically prohibited from

doing directly himself. *E.g., U.S. v. Hammad*, 858 F.2d 834, 840 (2nd Cir. 1988)

(agreeing with district court's decision prosecuting attorney violated ethical rule that

prohibited direct contact with suspect known to be represented by counsel by using

informant to contact said suspect indirectly).

**C.** **Rice Also Violated Rule 1.7, As There Is No Record Of His Terminating His Attorney-Client Relationship With SHA Prior To Rice's Representing Threatt Against SHA**

SHA Defendants might be remis if they did not also note there is no record of

Rice's terminating his prior attorney-client relationship with SHA before Rice's

September 4, 2019 letter to SHA's Board of Commissioners stating he was

representing Threatt, individually, against SHA. Thus, Rice also violated Rule 1.7,

which prohibits an attorney from representation adverse to a current client.

This Court has held that, in addition to any contractual duties imposed on

attorneys, they also owe:

> a duty of loyalty that precludes lawyers from suing a current client—
> even if the lawyer thinks the client has breached a term of their
> employment contract. The court understands that such a duty of loyalty
> does not prevent the lawyer from terminating the attorney-client
> relationship -- if it can be done in a manner consistent with Rule 1.16(b)
> -- and then suing the (now) former client (if not prohibited by other
> relevant ethical rules). But the duty of loyalty does prevent a lawyer
> from treating a current client like a former client before **formally**
> ending the attorney-client relationship.

*S. Visions, LLP v. Red Diamond, Inc.*, 370 F. Supp. 3d 1314, 1330 (N.D. Ala. 2019)

(emphasis added).

Despite such additional duty, that is what happened here. Rice began representing Threatt adversely against his then-current client, SHA, before he formally terminated his attorney-client relationship with SHA. Thus, Rice should also be disqualified for violating Rule 1.7.

## VI.    IMPUTED DISQUALIFICATION

Although SHA has not uncovered any evidence Plaintiff's other counsel, Winston and Cooks, have ever represented SHA, SHA requests the Court inquire into whether Rice shared SHA's privileged or confidential information obtained in connection with Rice's representation of SHA with Winston and Cooks, such that Winston and Cooks should also be disqualified.

Movants have no reason to and do not, at this time, imply Winston and Cooks violated any of the applicable Rules of Professional Conduct in connection with their representation of Threatt in this matter. However, Movants request the Court inquire as to whether Winston and Cooks received SHA privileged or confidential information from Rice in connection with their joint representation of Threatt adverse to SHA.

In a similar situation, the Former Fifth Circuit reversed co-counsel's disqualification and remanded a case for the district court to make further findings, holding co-counsel "should not be disqualified unless he has learned from [the disqualified attorney] information the [client] had intended not be disclosed to the

[opposing party]." *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 174 (5th Cir. 1979).

In another case, the Former Fifth Circuit considered a "twist to the usual attorney-client controversy," where co-defendants of a former client sought to disqualify counsel because the attorney received privileged information from his client in preparation of a joint defense of a conspiracy case, that could be used to the detriment of one of the co-defendants. *Wilson P. Abraham Const. Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977).

Additionally, the Middle District noted:

> The proof of a prior attorney-client relationship in a substantially related matter also entitles the former client to a "presumption that any confidences given to the attorney were shared among the attorney's partners and employees associated with the attorney at the time."

*Green v. Montgomery Cty., Ala.*, 784 F. Supp. 841, 844, *quoting In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 89 (5th Cir. 1976), which further stated:

> These presumptions would seem necessary to aid the frank exchange between attorney and client by helping to preclude even a possibility that information given in confidence by the former client will be used without the client's consent. Public perception of that possibility will tend to undermine public confidence in the legal profession and the judicial process even if the former client is not in fact damaged.

530 F.2d at 89.

Although Winston and Cooks were not partners of or in the same law firm with Rice at the time Rice represented SHA, they are currently (and have been for some time) associated as co-counsel with Rice in this litigation. Thus, it is necessary to determine whether Winston and Cooks obtained SHA privileged or confidential information from Rice that SHA did not intend to share with Winston and Cooks, and/or that could be used to the detriment of SHA, such that it taints and disqualifies them from their continued representation of Threatt in this action.

Unless the Court, in the alternative, adopts the irrebuttable presumption that SHA privileged or confidential information irrebuttably presumed to have been disclosed to Rice was further disclosed to Cooks and Winston, disqualifying them, too, Movants request the Court inquire into whether Winston and Cooks received SHA privileged or confidential information from Rice that Rice irrebuttably is presumed to have obtained during his former representation of SHA, and further, Movants ask the Court to consider the question of whether Winston and Cooks should be permitted to use SHA privileged or confidential information obtained from Rice in their joint representation of Threatt in claims adverse to SHA, especially considering that Rice could not use such information himself.[6]

---

[6] The rationales of *Green* and *Freund* seem equally applicable here and would seem to lead to an irrebuttable presumption Cooks and Winston acquired all relevant SHA's confidential information from their co-counsel Rice that Rice is irrebuttably presumed to have acquired from his prior representation of SHA, but candidly Defendants recognize *Brennan's, Inc.* appears to preclude from necessarily applying such an irrebuttable presumption to co-counsel such as Cooks and

# VII.   CONCLUSION

Because Rice had an attorney-client relationship with SHA in which the subjects of the representation were substantially related to the subjects of Rice's current representation of Threatt and the claims Rice asserts on behalf of Threatt, Rice is disqualified from representing Threatt in this case.

Movants also contend it is likely Rice shared any SHA privileged information he obtained from Threatt with co-counsel Winston and Cooks in connection with their joint representation of Threatt in this matter.  As such, Movants request the Court inquire into whether Winston's and Cooks' receipt of SHA privileged information precludes them from continuing to represent Threatt in this case, to SHA's detriment or in the alternative, "irrebutably [sic] presume that relevant confidential information was disclosed" by Threatt to Cook and Winston, thereby disqualifying them too.  Defendants submit this alternative is the only approach consistent with the irrebuttable presumption the Eleventh Circuit applies per its decision in *Freund v. Butterworth*.

---

Winston.  Consequently, Defendants respectfully request that this Court conduct the inquiry *Brennan's, Inc.* requires into what SHA information Cooks and Winston acquired from Rice in a manner that protects SHA's privileged or confidential information, even if doing so entails sealing the record of said inquiry.

# VIII. <u>RELIEF REQUESTED</u>

WHEREFORE, Movants respectfully request the Court enter an Order (i) finding Rice had an attorney-client relationship with SHA, (ii) finding Rice's prior attorney-client relationship and representation of SHA is substantially related to his representation of Threatt in this case, in violation of the applicable Rules, (iii) disqualifying Rice from representing Threatt in this case, and (iii) imposing any further disciplinary action against Rice as the Court deems appropriate, including without limitation, an award of SHA Movants' reasonable attorneys' fees and expenses incurred in connection with this Motion.

Movants also respectfully request the Court inquire into whether Rice's sharing SHA's privileged or confidential information with his co-counsel Winston and Cooks in their joint representation of Threatt similarly disqualifies Winston and Cooks from further representing Threatt in this case. Or in the alternative, and consistent with *Freund v. Butterworth*, apply an irrebuttable presumption that "relevant confidential information was disclosed" to Cooks and Winston by Rice that similarly disqualifies Cooks and Winston, too.

Finally, Movants respectfully request the Court enter an Order precluding Threatt from using or attempting to use any SHA privileged or confidential information Rice, Winston and/or Cooks obtained to support Threatt's claims in this action and otherwise.

Respectfully submitted this 8th day of October, 2020.

s/ *Brandi B. Frederick*
Richard W. Lewis (ASB-1812-L75R)
Brandi B. Frederick (ASB-4725-B59B)
Attorneys for SHA, Commissioners
Patrick Lozito, James Adams, Matt
Hubbard, and Phillip Morris

OF COUNSEL:

Austill Lewis Pipkin & Maddox, P.C.
600 Century Park South, Suite 100
Birmingham, AL 35226
(205) 870-3767 phone
(205) 870-3768 fax
r-lewis@maplaw.com
bfrederick@maplaw.com

s/ *Barry V. Frederick* (w/permission)
Barry V. Frederick (ASB-1979-C65B)
Attorney for Commissioner Alma Jean
Cook

OF COUNSEL:

The Frederick Firm
5409 Trace Ridge Lane
Birmingham, AL  35244
(205) 739-0043 phone
(205) 739-0044 fax
barry@frederickfirm.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 8th day of October, 2020, I served a copy of the above and foregoing on counsel for all parties by using the Court's ECF filing system that will send notification of such to all counsel of record, including:

Barry Vaughn Frederick
The Frederick Firm
5409 Trace Ridge Lane
Birmingham, AL 35244
Email Address: barry@frederickfirm.net
    Attorney For: Alma Jean Cook

C. David Stubbs
Stubbs, Sills & Frye P.C.
1724 South Quintard Avenue
Anniston, AL 36202
Email Address: david-ssf@cableone.net
    Attorney For: Jim Heigl

Roderick T. Cooks
Lee D. Winston
Winston Cooks, LLC
The Financial Center
505 20th Street North, Suite 815
Birmingham, AL 35203
Email Address: rcooks@winstoncooks.com; lwinston@winstoncooks.com
    Attorney For: Michael C. Threatt

Richard A. Rice
The Rice Firm, LLC
420 20th Street
Suite 2200
Birmingham, AL 35203
Email Address: rrice@rice-lawfirm.com
    Attorney For: Michael C. Threatt

s/ *Brandi B. Frederick*
OF COUNSEL