FILED

2021 Feb-12  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL C. THREATT,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 1:20-cv-00096-ACA** |
| | } | |
| **SYLACAUGA HOUSING** | } | |
| **AUTHORITY, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Michael Threatt is the former Chief Executive Officer of the Sylacauga Housing Authority ("SHA"). After the SHA terminated Mr. Threatt's employment, Mr. Threatt filed this lawsuit against the SHA; SHA Commissioners James Adams, Alma Cook, Matt Hubbard, Patrick Lozito, and Phillip Morris; and Sylacauga Mayor Jim Heigl. Mr. Threatt alleges that each of the Defendants discriminated against him and retaliated against him in violation of various constitutional and federal statutory rights.

This matter is before the court on Defendants SHA and Commissioners Adams, Cook, Hubbard, Lozito, and Morris's motion to disqualify Richard Rice as counsel for Mr. Threatt for alleged violations of Rules 1.9 and 1.7 of the Alabama

Rules of Professional Conduct and the American Bar Association Model Rules of Professional Conduct ("Model Rules").  (Doc. 55).

The court held a hearing on the motion to disqualify on January 15, 2021.[1] Having considered the entire record, including the evidence presented at the hearing and the parties' briefs, the court **DENIES** Defendants' motion to disqualify Mr. Rice because the court finds that Defendants have not met their burden of establishing that Mr. Rice violated an applicable rule of professional conduct.

## I.    BACKGROUND AND PROCEDURAL HISTORY

 Mr. Threatt served at the Chief Executive Officer of the SHA from October 2018 until his termination in October 2019.  (Tr. at 28, 31; Doc. 31 at ¶ 28).  Mr. Threatt was responsible for coordinating the SHA's day-to-day operations and overseeing public housing management, maintenance, development, and construction.  (Tr. at 57; Doc. 31 at ¶ 24).

In February 2019, Mr. Threatt learned that the U.S. Department of Housing and Urban Development ("HUD") had identified the SHA as high-risk for segregation in its housing programs.  (Tr. at 28).  In response, and in his capacity as SHA CEO, Mr. Threatt contacted Mr. Rice and another attorney, April Collins, to ask whether they could provide a civil rights and fair housing assessment for the

---

[1] A court reporter was present, and a transcript is available upon request.  Throughout this opinion, the court cites to the draft transcript as Tr. with the corresponding page number(s).

SHA.  (Tr. at 32–33, 137–41; Doc. 79-1 at 1).  The intended purpose of the assessment was to help the SHA correct the deficiencies identified by HUD and ensure compliance going forward.  (*Id.*).  The SHA wanted Mr. Rice to handle the civil rights portion of the assessment, and Ms. Collins  to work on the fair housing portion of the assessment.  (Tr. at 137 ; Doc. 79-1 at 1, 5).

Mr. Threatt, Mr. Rice, and Ms. Collins met in early March 2019 to review Mr. Threatt's request and to tour the City of Sylacauga and some of the properties that the SHA manages.  (Tr. at 33–34, 140–41; Doc. 79-1 at 4).  During this meeting, the three discussed fair housing laws and how the SHA could address the identified segregation issue through an assessment that would create a plan to improve quality of life and civil rights issues.   (Tr. at 34, 128–29,140, 144–45).

About a week after the tour, Mr. Rice emailed Mr. Threatt and thanked him for the opportunity "to provide the civil rights assessment for your Housing Authority."  (Doc. 79-1 at 9).  Mr. Threatt forwarded a copy of Mr. Rice's email to two other SHA employees and explained that the email was "from the Civil Rights attorney."  (Doc. 80-1 at 1).

Several days later, Mr. Threatt emailed a draft scope of work for the fair housing and civil rights assessment to Mr. Rice and Ms. Collins.  (Doc. 79-1 at 11; *see also* Doc. 80-2 at 3–8).  Mr. Rice and Ms. Collins expressed doubts about

completing the scope of the work with the limited budget available for the assessment.  (Doc. 80-2 at 1–2).

Mr. Threatt responded to Mr. Rice and Ms. Collins and stated that a proactive assessment and plan for both Fair Housing and Civil Rights was cost-effective and promised to "have more information soon" after he had an opportunity to follow-up with his staff regarding an "administratively feasible scope of work." (*Id.* at 1).  Mr. Threatt asked whether Mr. Rice and Ms. Collins could "perform this work for the SHA" in April 2019.  (*Id.*).  Mr. Rice and Ms. Collins confirmed that they could perform the work they discussed during their tour of Sylacauga.   (Doc. 80-2 at 1–2).  There is no evidence that Mr. Rice or Ms. Collins entered a written contract with the SHA to provide the assessment or that they received any payment from the SHA. And neither Mr. Rice nor Ms. Collins performed the assessment.  (Tr. at  45).

Still, during the spring and summer of 2019, Mr. Threatt emailed several documents to three SHA employees in which he referred to Mr. Rice as the SHA's "civil rights attorney" or otherwise identified Mr. Rice's law firm as providing an assessment for the SHA.  (Doc. 80-1 at 1; Doc. 80-4 at 3; Doc. 80-5 at 4; Doc. 80-7 at 3–4).  Mr. Threatt also forwarded earlier emails from Mr. Rice and Ms. Collins to his staff and stated that he needed their help securing Mr. Rice and Ms. Collins for the assessments.  (Doc. 80-9 at 1).

In July 2019, Mr. Threatt hired Mr. Rice to represent him with respect to a personal employment dispute with the SHA.  (Tr. at 47).  Shortly after, Mr. Rice forwarded an email to Mr. Threatt with the subject line "QUI TAM."  (Doc. 80-10). The email contained information about "ground-breaking" False Claims Act litigation regarding allegations that a county falsely certified that it had complied with its responsibility under the Fair Housing Act to affirmatively further fair housing in order to receive HUD funding.  (*Id.* at 1).

In early September 2019, the SHA placed Mr. Threatt on administrative leave (doc. 31 at ¶ 87–89), and Mr. Rice sent a letter to Commissioners Hubbard, Morris, Cook, Lozito, and Adams explaining that he represented Mr. Threatt with respect to his employment with the SHA (doc. 56-8).

The SHA terminated Mr. Threatt's employment in late October 2019.  (Tr. at 28).  In January 2020, Mr. Rice, on behalf of Mr. Threatt, filed this lawsuit against the SHA, alleging that the SHA discriminated and retaliated against him in violation of Title VII, the False Claims Act, and the Fair Housing Act when it terminated his employment.  (Doc 1).  With leave of court, Mr. Threatt filed an amended complaint that added claims against SHA Commissioners Adams, Cook, Hubbard, Lozito, and Morris and Sylacauga Mayor Jim Heigl.  (Doc. 31).

The amended complaint alleges that Mr. Threatt suffered personal race discrimination and retaliation in the workplace.  (Doc. 31 at ¶¶ 43, 54.a–b, 59, 61,

106–110, 157–58).  The amended complaint also alleges that Mr. Threatt reported to the SHA Board of Commissioners and various outside local and federal agencies concerns about alleged fraudulent billing practices, discriminatory housing programs, the SHA's high risk for segregation, and his belief that the SHA's use of federal funds did not comply with Fair Housing Act and HUD reporting and recording requirements.  (Doc. 31 at ¶¶ 43–44, 55–57, 71–73, 82–85).  According to the amended complaint, the SHA placed Mr. Threatt on leave and terminated his employment after he reported these issues.  (Doc. 31 at ¶¶ 55–57, 71–73, 82–83, 87, 98, 129–139, 142–155) .

The amended complaint asserts the following counts: (1) race discrimination in violation of Title VII and § 1981, via § 1983, against the SHA; (2) race retaliation in violation of Title VII and § 1981, via § 1983, against the SHA; (3) retaliation in violation of the Fair Housing Act against the SHA; (4) retaliation in violation of the False Claims Act against the SHA; and (5) § 1983 race discrimination against SHA Commissioners Adams Cook, Hubbard, Lozito, and Morris and Mayor Heigl.  (Doc. 31 at 23–30).

## II.   DISCUSSION

Two sources of authority govern motions to disqualify.   *Herrmann v. Gutterguard, Inc.*, 199 F. App'x 745, 752 (11th Cir. 2006) (per curiam).[2]   "First, attorneys are bound by the local rules of the court in which they appear." *Id.*   The Alabama Rules of Professional Conduct and the American Bar Association Model Rules of Professional Conduct, when not inconsistent with the Alabama Rules, govern the conduct of attorneys who appear in this court. *See* N.D. Ala. R. 83.1(f). Second, federal common law "governs attorneys' professional conduct because motions to disqualify are substantive motions affecting the rights of the parties." *Herrmann*, 199 F. App'x at 752.

"The party moving to disqualify counsel bears the burden of proving the grounds for disqualification." *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003). "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if 'compelling reasons' exist." *Id.*   One of those compelling reasons is a violation of applicable rules of professional conduct. *See Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997). Where a party seeks disqualification based on an alleged ethical violation, "[t]he court must

---

[2] *Herrmann* is an unpublished opinion; "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.  The court cites and relies on *Herrmann* for its persuasive value.

clearly identify a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction and must conclude that the attorney violated that rule." *Id.* "Disqualification is a harsh sanction, often working substantial hardship on the client," and "should be resorted to sparingly." *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n.4 (11th Cir. 1982)

Defendants argue that the court should disqualify Mr. Rice because he formerly represented or currently represents the SHA on "civil rights" issues, and he has "switched sides" to represent Mr. Threatt in this action, in violation of Alabama Rules of Professional Conduct 1.9 and 1.7 and their Model Rules counterparts. (Doc. 57 at 2). The court considers each set of rules in turn.

1.    <u>Rule 1.9</u>

Defendants ask the court to disqualify Mr. Rice because they claim he previously represented the SHA, and his representation of Mr. Threatt in this action violates Rule 1.9 of the Alabama Rules of Professional Conduct and the Model Rules regarding conflicts of interest involving former clients. (Doc. 57 at 12–21).

Alabama Rule of Professional Conduct 1.9 provides that "[a] lawyer who formerly represented a client in a matter shall not" then "[r]epresent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client, unless the former client consents after consultation" or "[u]se information relating to the representation to

8

the disadvantage of the former client" except as certain rules permit or require "or when the information has become generally known."  Ala. Rules of Prof'l Conduct R. 1.9(a)-(b).

Model Rule 1.9 similarly prohibits an attorney "who has formerly represented a client in a matter" from representing another person "in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing" and from "us[ing] information relating to the representation to the disadvantage of the former client" except as allowed by the Model Rules "or when the information has become generally known."  Model Rules of Prof'l Conduct R. 1.9(a), (c).

A former client seeking disqualification under Rule 1.9 must show that it had an attorney-client relationship with the attorney it seeks to disqualify, and that the attorney represented the former client in a substantially related matter.  *Ex parte Tiffin*, 879 So. 2d 1160, 1165 (Ala. 2003).  If—*and only if*—a former client demonstrates that the previous and current representation is substantially similar, then the former client is entitled to an irrebuttable presumption "that relevant confidential information was disclosed during the former period of representation." *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir. 1999); *see id.* at 859–60 ("*[U]pon a showing of substantial relatedness*, we presume that the former      client

. . . divulged to the lawyer . . . all of his or her confidences relevant to the subject of the representation.") (emphasis added).

As explained below, the question of whether Mr. Rice had an attorney-client relationship with the SHA is a close call. But even if Mr. Rice had an attorney-client relationship with the SHA, Defendants have failed to satisfy their burden of showing that any previous representation is substantially related to this action.  And because Mr. Rice did not represent the SHA in a substantially related matter, the court does not presume that Mr. Threatt disclosed relevant confidential information to Mr. Rice as part of the previous representation.

a.     *Attorney-Client Relationship*

"To create an attorney-client relationship, there must be an employment contract 'either express or implied' between an attorney and the party for whom he purports to act or someone authorized to represent such party." *Mississippi Valley Title Ins. Co. v. Thompson*, 802 F.3d 1248, 1253 (11th Cir. 2015) (quotations omitted).  "In this context, the perception and intent of the putative client as to the formation of that contract is particularly relevant." *Id.*

But an attorney-client relationship may exist before a client formally hires an attorney because a "fiduciary relationship extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result." *Green v. Montgomery Cnty.*, 784 F. Supp. 841, 845

(M.D. Ala. 1992) (quotations omitted).  Thus, the "existence of an express contract of employment, or the payment of legal fees, or the length of the consultation" is not dispositive.  *Id.*  Instead, the test for determining the existence of an attorney-client relationship is subjective and "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention is to seek professional legal advice."  *Id*. at 845–46.

Although the record contains no evidence that the SHA formally hired Mr. Rice or paid him any fees, the evidence demonstrates that Mr. Threatt, in his capacity as SHA CEO, subjectively intended to seek professional legal advice from Mr. Rice for purposes of providing the SHA with a civil rights assessment.  Mr. Threatt contacted Mr. Rice and met with him for an initial discussion about the scope of work that Mr. Threatt hoped Mr. Rice would perform as part of his civil rights assessment for the SHA.  (Tr. at 32–33).  After Mr. Rice expressed hesitation about the initial scope of work, Mr. Threatt agreed that a cost-effective approach was desirable, promised to get more information, and asked whether Mr. Rice could "perform this work for the SHA." (Doc. 80-2 at 1).  Mr. Rice confirmed that he could perform the work discussed during the March meeting.  (*Id.*)  Consistent with Mr. Threatt's promise to provide "more information," in July 2019, emailed his executive staff and requested their help securing Mr. Rice for the assessment.  (Doc. 80-9 at 1).

Mr. Threatt's subjective intent to engage Mr. Rice as an attorney for the SHA also is evidenced by a number of other emails that Mr. Threatt sent to members of his executive staff.  On multiple occasions during the spring and summer of 2019, Mr. Threatt frequently referred to Mr. Rice or the Rice Law Firm as the SHA's "civil rights attorney" in communications to other SHA employees.  (Doc. 80-1 at 1; Doc. 80-4 at 3; Doc. 80-5 at 3–4; Doc. 80-6 at 5; Doc. 80-6-6 at 3–4).

Whether this evidence demonstrates that Mr. Rice had an attorney-client relationship with the SHA is a difficult question.  The record shows that Mr. Threatt manifested an intention to consult Mr. Rice in his capacity as an attorney to conduct a civil rights assessment on behalf of the SHA and that Mr. Threatt subjectively considered Mr. Rice to be the SHA's "civil rights attorney." But the record also shows that limited initial discussions about the civil rights assessment did not materialize into a formal agreement about the scope of the work, and the work was not done.

Ultimately, whether there was an attorney-client relationship is not dispositive because as explained below, Defendants cannot show that any prior representation is substantially related to Mr. Rice's representation of Mr. Threatt in this lawsuit. Therefore, the court assumes without deciding that Mr. Rice and the SHA had an attorney-client relationship.

> b. *Mr. Rice's Previous Representation is not Substantially Related to This Action*

When determining whether prior and present matters are substantially related, the focus of the court's inquiry "'should be on the precise nature of the relationship between the present and former representations.'" *Herrmann*, 199 F. App'x at 752 (quoting *Duncan v. Merrill Lynch*, 646 F.2d 1020, 1029 (5th Cir. Unit B 1981)[3], *overruled on other grounds, Gibbs v. Paluk*, 742 F.2d 181 (5th Cir. 1984)). "[T]he [substantial relationship] test entails inquiry into the similarity between the factual situations, the legal issues posed, and the nature and extent of the attorney's involvement to see if information from the prior representation is material to the new representation." *Ex parte Regions Bank*, 914 So. 2d 843, 848 (Ala. 2005) (quotations omitted)

"The court can only determine if the substantial relationship test has been met 'when the moving party delineates with specificity the subject matters, issues, and causes of action presented in former representation.'" *Hermann*, 199 F. App'x at 753 (quoting *Cox v. Am. Cast Iron Pipe Co.*, 847 F.2d 725, 730 (11th Cir. 1988)). "'Merely pointing to a superficial resemblance between the present and prior representations'" will not suffice. *Ex parte State Farm Mut. Auto. Ins. Co.*, 469 So. 2d 574, 575–76 (quoting *Duncan*, 646 F.2d at 1029). "The moving party has to show

---

[3] Decisions from a Unit B panel of the former Fifth Circuit are binding in the Eleventh Circuit. *See Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

more than the mere fact that as a result of a former representation, the attorney has knowledge of the moving party's practices and procedures." *Herrmann*, 199 F. App'x at 753.  Instead, "[t]he moving party must demonstrate that the attorney 'has knowledge of the particular practices and procedures which are the subject matter of [the] suit.'"  *Id.*  (quoting *Duncan*, 646 F.2d at 1032).

Defendants have not met their burden of showing that Mr. Rice's prior representation is substantially similar to Mr. Threatt's lawsuit.

The gist of Defendants' first argument is that Mr. Threatt's intention that Mr. Rice would assess the SHA's "civil rights" issues necessarily means that that the scope of work that Mr. Rice agreed to perform includes the "civil rights" claims that Mr. Threatt now asserts against the SHA in this action.  (Doc. 57 at 17–19).  This claim is an improper "blanket assertion," *see Ex Parte Regions Bank*, 914 So. 2d at 849, that does not identify with any specificity any similarity between the facts and legal issues surrounding the "civil rights" assessment that Mr. Rice was to perform and the claims in this action.

Defendants' reliance on the information contained in the draft scope of work that Mr. Threatt emailed to Mr. Rice (*see* doc. 57 at 18–19 & n.5) does not assist them either.  Defendants maintain that the draft scope of work contemplates an analysis of racial concentrations and disparities in the SHA's public housing offerings which they claim is related to Mr. Threatt's allegation in this action that

14

the SHA retaliated against Mr. Threatt after he told Board members that the SHA "'was engaging in unlawful housing practices that resulted in discrimination and segregation'" and after he reported "'discriminatory housing practices.'"  (Doc. 57 at 18, quoting Doc. 31 at ¶¶ 129, 135).

But this argument overlooks that Mr. Rice expressed concern with the initial scope of work, did not agree to provide the assessment outlined in the initial scope of work, and in fact, never actually performed a civil rights assessment for the SHA. Therefore, to the extent the draft of scope of work identifies some topics for analysis that generally overlap with any of Mr. Threatt's allegations in this case, the draft scope of work does not show that the matters are substantially related because Mr. Rice rejected the draft scope of work and never completed the tasks outlined in the document.   In this regard, the court is mindful that the extent of an attorney's involvement bears on the determination of whether a matter is substantially related. Although Mr. Rice and Mr. Threatt had preliminary discussions about a potential "civil rights" assessment for the SHA, the work was not performed.  Thus, the evidence does not demonstrate that Mr. Rice "was so involved in the [previous] matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question."  Ala. Rules of Prof'l Conduct R. 1.9 cmt.

Defendants also posit that because Mr. Threatt and Mr. Rice discussed "housing segregation" during their initial meeting, any claims based on the

allegation that the SHA retaliated against Mr. Threatt for complaining about segregated or discriminatory housing is substantially related to Mr. Rice's previous representation.  (Doc. 64 at 7).  Defendants' argument again relies on generalities and does not establish how Mr. Rice's initial consultation and communications with Mr. Threatt about segregated housing for purposes of a proposed "civil rights" assessment are central to the legal issues present in Mr. Threatt's current employment discrimination action.

In addition, Defendants have offered no evidence linking Mr. Threatt's engagement of Mr. Rice for a "civil rights" assessment to the alleged *personal* race-based discrimination and retaliation.  At best, counsel for Commissioner Cook attempted to imply a link during the evidentiary hearing (*see* Tr. 123–27), but the court rejects any notion that Mr. Threatt's allegations that the SHA and individual defendants discriminated against him personally because he is African-American are connected to any purported segregated housing issues with the SHA.

The court also is not persuaded by Defendants' contention that the previous representation is substantially related to Mr. Threatt's False Claims Act retaliation claim based on Mr. Rice's email to Mr. Threatt about unrelated False Claims Act litigation.  (*See* Doc. 57 at 18).  The evidence in the record demonstrates that Mr. Rice's civil rights assessment would have focused on correcting segregated housing issues, not the SHA's use of federal funds or any purported false claims that the SHA

was submitting to the federal government.  (Tr. at 28, 32–34, 128–29, 140, 143–45).

Therefore, the court finds that the False Claims Act email does not bear on the Mr.

Rice's previous representation at all.

But even assuming the email is somehow connected to Mr. Rice's prior

representation, the summary of the lawsuit described in Mr. Rice's email does not

present the same legal issue or claim that Mr. Threatt asserts against the SHA.  The

lawsuit described in the email concerned a relator's False Claims Act action against

a county based on allegations that the county obtained federal funds from HUD and

other governmental agencies by falsely certifying that it had complied with certain

obligations under the Fair Housing Act.  (Doc. 56-7 at 1–2).  Mr. Threatt has not

accused the SHA of obtaining federal funds under false pretenses.  Rather, Mr.

Threatt claims that the SHA retaliated against him for reporting and opposing what

he believed to be fraudulent billing practices based on misappropriation of federal

funds and other improper spending.  (Doc. 31 at ¶ 141–156).  Therefore, the email

does not demonstrate that Mr. Rice's previous representation of the SHA is

substantially related to his representation of Mr. Threatt in this action.

Finally, Defendants submit that Mr. Threatt spoliated evidence by deleting

emails from his SHA electronic devices, and therefore, they are entitled to an

inference that the emails would demonstrate that the prior and present matters are

substantially related.  (Tr. at 84, 101, 113–14).  This argument suffers from multiple deficiencies.

Defendants attempt to show that Mr. Threatt deleted emails in two ways. First, they offered testimony from two witnesses during the January 15, 2021 hearing. But neither witness had personal knowledge that Mr. Threatt deleted the emails, and their testimony established only that there was a "big gap in emails" between 2018 and 2020, not that Mr. Threatt deleted the emails.  (Tr. at 85–94; *see also* Tr. at 5–6).

Second, Defendants ask the court to find that Mr. Threatt deleted the emails through an unanswered request for admission.  (Tr. at 76–77, 115).  Defendants filed their motion to disqualify all three of Mr. Threatt's attorneys on October 8, 2020. (Doc. 55).  Then, while the parties were still briefing the motion to disqualify, Defendants served a request for admission on Mr. Threatt's counsel asking Mr. Threatt to admit that he "deleted all emails sent to or from mthreatt@sylacauagha.com for the period March 28, 2018 through September 10, 2019."  (Doc. 81-1 at 1).  It is undisputed that Mr. Threatt did not respond to the request for admission within 30 days.  Therefore, by operation of Federal Rule of Civil Procedure 36(b), the matter is "conclusively established" in the absence of a motion to withdraw or amend the admission. Fed. R. Civ. P. 36(b).

The court finds it disingenuous that Defendants would issue requests for admission to Mr. Threatt's attorneys while seeking their disqualification, and then use an unanswered request to establish a fact supporting their disqualification. But even if the court were to find, by operation of Mr. Threatt's unanswered request for admission, that he deleted emails sent to or from his SHA email address, Defendants are not entitled to the spoilation inference they seek for purposes of this motion.

Federal Rule of Civil Procedure 37(e) governs the court's analysis of Defendants' request that the court draw an adverse inference against Mr. Threatt based on the missing emails. Under Rule 37, if "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take steps to preserve it" and the information "cannot be restored or replaced through additional discovery," the court may "presume that the lost information was unfavorable to the party," if the court finds "that the party acted with the intent to deprive another party of the information's use in the litigation. . . ." Fed. R. Civ. P. 37(e)(2)(A).

As an initial matter, the undisputed evidence shows that Mr. Rice did not communicate with Mr. Threatt about any SHA-related business on any personal email account, and Mr. Rice has provided a complete copy of all emails he sent to and received from Mr. Threatt's SHA email address. (Tr. at 103–05, 113; *see* doc. 79-1). The SHA has not explained what emails Mr. Threatt could have exchanged

19

with anyone other than Mr. Rice that would show that Mr. Rice's earlier representation of SHA is substantially related to his current representation of Mr. Threatt. And the SHA itself has been able to recover some of Mr. Threatt's emails associated with his SHA account. (Doc. 80-1; Doc. 8-2; Doc. 80-3; Doc. 80-4; Doc. 80-5; Doc. 80-6; Doc. 80-7; Doc. 80-8; Doc. 80-9; Doc. 80-10). Thus, it appears that any missing emails relevant to question of whether the previous and current representation are substantially related can or have been replaced through other means.

Moreover, assuming Mr. Threatt deleted the emails, Defendants have presented no evidence suggesting—much less establishing—that Mr. Threatt deleted the emails "with the intent to deprive [Defendants] of the information's use" in demonstrating that Mr. Rice's previous representation of the SHA is substantially related to his representation of Mr. Threatt in this case. Fed. R. Civ. P. 37(e)(2). Even if Mr. Threatt could have anticipated the need to preserve the emails with respect to the claims and defenses in this case, there is simply no evidence in the record showing that Mr. Threatt could have anticipated that Defendants would file a motion to disqualify his counsel or that Mr. Threatt should have taken reasonable steps to preserve the emails in connection with such a motion. Therefore, the court cannot find that he acted with any intent to prevent Defendants from accessing the emails for purposes of using those emails as evidence in support of their motion to

disqualify.  Accordingly, the court will not draw an adverse inference against Mr. Threatt that the missing emails would demonstrate that the previous and current representations are substantially related.

In sum, Defendants have not satisfied their burden of showing that Mr. Rice's previous representation of the SHA is substantially related to his representation of Mr. Threatt in this employment discrimination lawsuit.  Therefore, Mr. Rice has not violated Rule 1.9, and the court will not disqualify him on that basis.

2.     Rule 1.7

Defendants argue that because there is no record of Mr. Rice terminating his attorney-client relationship with the SHA before his representation of Mr. Threatt began, the court should disqualify Mr. Rice for his violation of Alabama Rule of Professional Conduct 1.7 regarding conflicts of interest involving current clients. (Doc. 57 at 22–23).

Alabama Rule of Professional Conduct 1.7 states, in relevant part, that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) Each client consents after consultation."  Ala. Rules of Prof'l Conduct R. 1.7(a).

Model Rule 1.7 likewise prohibits—subject to certain exceptions— an attorney from representing a client if the representation will be "directly adverse" to

another client or if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Model Rule of Prof'l Conduct R. 1.7(a)-(b)

A party seeking disqualification of an attorney for a violation of Rule 1.7 must demonstrate: (1) that it is a current client of the lawyer whose representation is challenged, and (2) that the party's interests 'conflict' with the interests of the other client, or with the interests of the lawyer." *Ex parte Tiffin,* 879 So. 2d 1160, 1164–65 (Ala. 2003) (emphasis omitted).

Defendants have presented no evidence that the SHA is a current client of Mr. Rice's. Rather, Defendants claim that because Mr. Rice previously represented the SHA and there is no formal record of his terminating that relationship, then the SHA remains a client of Mr. Rice's. (Doc. 57 at 22). Defendants' position asks too much. It is unsurprising that there is no official record of Mr. Rice terminating his attorney-client relationship with the SHA because the SHA did not formally hire Mr. Rice. Instead, as explained above, an attorney-client relationship existed at one time because Mr. Threatt subjectively intended to engage Mr. Rice's services on behalf of the SHA to conduct the civil rights assessment. But the fact that an attorney-client relationship existed for a brief time in 2019 does not affirmatively demonstrate that Mr. Rice currently represents the SHA in any matter, and Defendants have offered

22

no evidence to that effect.  Indeed, the record contains no evidence of any substantive work Mr. Rice actually performed or currently performs on behalf of the SHA.

Accordingly, because the SHA is not a current client of Mr. Rice's, Mr. Rice has not violated Rule 1.7, and the court will not disqualify him on that basis.

## III.   CONCLUSION

For the reasons stated above, the court **DENIES** Defendants' motion to disqualify Mr. Rice from representing Mr. Threatt in this action.  (Doc. 55).

The court **SETS** a Rule 16(b) scheduling conference for **10:00 a.m.** on **February 25, 2021** in Courtroom 6B, Hugo L. Black United States Courthouse, 1729 5th Ave. N., Birmingham, AL 35203.

Counsel shall be prepared to discuss revised discovery deadlines.

**DONE** and **ORDERED** this February 12, 2021.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE