FILED

2022 Sep-28  PM 04:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL C. THREATT,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 1:20-cv-00096-ACA** |
| | } | |
| **SYLACAUGA HOUSING** | } | |
| **AUTHORITY, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

### MEMORANDUM OPINION

Plaintiff Michael Threatt is the former Executive Director of the Sylacauga Housing Authority ("SHA"). After the SHA terminated Mr. Threatt's employment, Mr. Threatt filed this lawsuit against the SHA; SHA Commissioners James Adams, Alma Cook, Matt Hubbard, Patrick Lozito, and Phillip Morris; and Sylacauga Mayor Jim Heigl. He alleges that each of the Defendants discriminated against him and retaliated against him in violation of various constitutional and federal statutory rights.

Mr. Threatt has dismissed his claims against Defendants James Adams, Alma Cook, and Jim Heigl. (Docs. 113, 115). The remaining claims are: (1) race discrimination, in violation of Title VII and 42 U.S.C. § 1981, against SHA ("Count One"); (2) retaliation, in violation of Title VII and § 1981, against SHA ("Count

Two"); (3) retaliation, in violation of the Fair Housing Act, against SHA ("Count Three"); (4) retaliation, in violation of the False Claims Act, against SHA ("Count Four"); (5) and race discrimination, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, via 42 U.S.C. § 1983, against Commissioners Hubbard, Lozito, and Morris in both their individual and official capacities. ("Count Five").

Before the court is SHA and Commissioners Hubbard, Lozito, and Morris's motion for summary judgment. (Doc. 123). The court **WILL GRANT IN PART** and **DENY IN PART** the motion for summary judgment.

The court **WILL GRANT** the motion for summary judgment as to Count One because Mr. Threatt has either not presented evidence to establish a *prima facie* case of discrimination, or he has not rebutted SHA's legitimate, non-discriminatory reasons for his termination. Nor has Mr. Threatt demonstrated a mosaic of circumstantial evidence from which a trier of fact could infer that SHA terminated him because of his race.

The court **WILL GRANT** the motion for summary judgment as to Count Two to the extent it is based on SHA's decision to terminate Mr. Threatt's employment because Mr. Threatt has not rebutted SHA's legitimate, non-retaliatory reasons for his termination. The court **WILL DENY** the motion for summary judgment as to Count Two to the extent it is based on SHA's decision to place Mr. Threatt on

administrative leave because the only argument SHA makes with respect to that claim does not entitle it to summary judgment.

The court **WILL DENY** the motion for summary judgment as to Count Three because the only argument SHA makes with respect to that count does not entitle it to summary judgment.

The court **WILL GRANT** the motion for summary judgment as to Count Four because Mr. Threatt has not shown that he engaged in protected activity under the False Claims Act.

The court **WILL GRANT** the motion for summary judgment as to Count Five to the extent it asserts claims against Commissioners Hubbard, Lozito, and Morris in their individual capacities because these defendants are entitled to qualified immunity on those claims. The court **WILL DENY** the motion for summary judgment as to Count Five to the extent it asserts claims for equitable relief against Commissioners Hubbard, Lozito, and Morris because these defendants have not moved for summary judgment on the claims asserted against them in their official capacities.

## I.   BACKGROUND

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party."

*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012)
(quotation marks omitted).

    1.    <u>SHA's Operational Structure</u>

    SHA is a public housing authority that owns and manages properties in
Sylacauga and Talladega counties. (Doc. 126-225 at ¶ 4). SHA is governed by a
Board of Commissioners ("BOC"). (Doc. 126-61 at 3). The BOC's role is to act as
policymakers for SHA and to supervise SHA's executive director. (Doc. 126-61 at
3; doc. 126-62 at 3). The BOC does not carry out the day-to-day management of
SHA. (Doc. 126-61 at 3).

    SHA's executive director is responsible for the day-to-day operations of the
Authority and for supervision of other employees. (Doc. 126-61). In November
2017, SHA's BOC unanimously voted to hire Mr. Threatt as its Executive Director.
(Doc. 126-109 at 2). At the time, the five SHA commissioners were Bill Roberts, Jr.,
Priscilla Cleveland, Alma Cook, Marvin Miller, and Matt Hubbard. (*Id.*).

    2.    <u>SHA Operations Under Mr. Threatt's Leadership</u>

    After taking office, Mr. Threatt began to implement a number of changes at
SHA. First, Mr. Threatt created and filled three new executive-level positions. (Doc.
126-98 at 59–60). Mr. Threatt first created the position of Chief Financial Officer
and hired Heather Mueller to fill it at an initial salary of $60,000. (*Id.*; *see also* doc.
126-80 at 9). Mr. Threatt then created the position of Chief Housing Officer and

hired Daniell Womack to fill the position at an initial salary of 65,000. (Doc. 126-145 at 7). Finally, Mr. Threatt created the position of Chief Human Resource Officer and hired Nicole Daniels to fill the position at an initial salary of $60,000. (Doc. 126-25 at 16; doc. 126-98 at 59–60). During these employees' first year of employment, Mr. Threatt awarded over $44,000 in pay increases for each woman. (Doc. 126-98 at 56; doc. 126-80 at 9–10; doc. 126-25 at 16; doc. 126-145 at 8–9).

Soon after being hired, Mr. Threatt's executive team conducted an internal assessment of SHA's finances. (Doc. 137 at ¶ 38). Based on that internal assessment, Mr. Threatt believed that SHA was mismanaging federal funds. (*See id*.; *see also* doc. 126-98 at 5). Mr. Threatt called an executive board meeting in September 2018 to inform the BOC of the results of the internal assessment and the need to conduct a forensic audit. (Doc. 137 at ¶ 38). Mr. Threatt also informed a Housing and Urban Development ("HUD") special agent of these findings and his plans to procure a forensic audit. (*Id*. at ¶ 30).

On October 30, 2018, the BOC held its regularly scheduled meeting. (Doc. 126-107). In addition to the audit, and with just days before Mr. Threatt's one-year employment contract was set to renew automatically, Mr. Threatt presented the BOC with proposed changes to SHA's by-laws and a new employment contract for Mr. Threatt, as drafted by Ms. Daniels and Mr. Threatt. (Doc. 126-98 at 28, 43, 56, 58–59; doc. 137 at ¶ 42).

The proposed contract increased Mr. Threatt's salary, car allowance, and retirement benefits. (Doc. 126-114; doc. 126-108; doc. 126-98 at 58). It also provided for immediate retirement vesting, removed the original contract's requirement that Mr. Threatt move to Sylacauga, and extended the term of Mr. Threatt's contract to five years. (Doc. 126-114; doc. 126-108; doc. 126-98 at 58). Whether the BOC executed the contract is disputed. Mr. Threatt contends that the Commissioners present at the meeting unanimously voted to approve the terms of his proposed contract. (Doc. 137 at ¶¶ 44, 45). But there is no record of a vote in the meeting minutes. (Doc. 126-119 at 43; doc. 126-178 at 25).

During this same meeting, the BOC passed a resolution agreeing to retain private accounting firms to conduct a forensic and fiscal audit of SHA's finances based on Mr. Threatt's belief that SHA was mismanaging federal funds. (Doc. 126-7; doc. 137 at ¶¶ 47, 48). The BOC retained the accounting firm of Borland Benefield to conduct a forensic audit of SHA's finances and retained the accounting firm of Henderson and DeJohn to conduct a fiscal audit of SHA's finances. (Doc. 126-7; doc. 137 at ¶ 48).

In the first half of 2019, the BOC underwent several changes in membership. First, in January 2019, Sylacauga Mayor Jim Heigl appointed James Adams to the Board of Commissioners. (Doc. 126-182 at 3). In March 2019, Mayor Heigl appointed Patrick Lozito to replace Marvin Miller as the BOC's chairman. (Doc.

126-119 at 75; doc. 137 at ¶ 65). And in May 2019, Mayor Heigl appointed Phillip Morris to replace Bill Roberts as a Commissioner. (Doc. 126-119 at 75; doc. 137 at ¶ 75).

In the midst of these leadership changes, Borland Benefield submitted its forensic review of SHA to the BOC. (Doc. 126-41). The review found various deficiencies in SHA's management of federal funds between June 30, 2014 to June 30, 2018. (*See id.*). Mr. Threatt provided these findings to HUD and to Mayor Heigl. (Doc. 137 at ¶¶ 57–58).

Two months later, a representative from Henderson and DeJohn shared the results of its audit of the June 30, 2018 fiscal year with the BOC. (*See* doc. 126-213 at 1–2). Like the forensic review conducted by Borland Benefield, Henderson and DeJohn's fiscal audit unearthed "significant deficiencies and some non-compliance." (*Id*. at 1). Mr. Threatt provided all of these findings to both HUD and Mayor Heigl. (Doc. 137 at ¶¶ 72–73).

At some point early in the Summer of 2019, Mr. Threatt began to work remotely. (Doc. 126-98 at 48; *see also* doc. 126-119 at 9). In July, three significant issues caught the BOC's attention. First, Mr. Threatt effectively ended the Head Start Program that serviced SHA's community. Second, two of SHA's three properties failed their preliminary assessments by the United States Inspection Group. Third,

Mr. Threatt failed to respond to the BOC Chairman's request for financial documents and a copy of Mr. Threatt's contract.

On July 16, Mr. Threatt terminated a longstanding lease between SHA and the Talladega Clay Randolph Child Care Corporation ("TCR"), which owned and managed the local Head Start childcare program. (Doc. 126-47; doc. 126-80 at 52). Mr. Threatt initially claimed his decision to terminate the lease was the presence of lead paint in the childcare facility (doc. 126-47 at 1), but later admitted the decision was made before testing for lead paint began (doc. 126-98 at 52). There is no evidence to suggest that Mr. Threatt found an alternate location.

Three days later, the BOC held a public meeting at which numerous community members voiced their concerns about closure of the Head Start program. (*See generally* doc. 125 at 42–75). Sylacauga City Council President Lee Perryman noted that the City's own inspectors found that the lead test results were not significant enough to warrant terminating the Head Start lease. (Doc. 126-229 at 59–61). A week later, large crowds gathered outside of SHA to protest the Head Start center's closing. (Doc. 126-58; doc. 126-119 at 47–48; doc. 137 at ¶ 100). Mr. Threatt had been working remotely for some time then and was not physically present during the protest. (Doc. 126-98 at 48–49). During the incident, presumably with Mr. Threatt's permission, Mr. Threatt's executive staff closed SHA's facility. (*Id*. at 48). But Mr. Threatt testified he would have been on the phone with his staff

and made the decision to shut down the facility based on information he received from staff. When questioned about the facility closure, Mr. Threatt testified there were "several times" he closed SHA's facility because of crowds outside, but he could not recall the other dates on which those closures occurred or whether he was physically present at SHA when the gatherings took place. (*Id.* at 48).

Also in July, the United States Inspection Group conducted preliminary assessments of SHA's three properties, Sylavon Court, Sylavon Tower, and Drew Court and the properties received poor scores. (Docs. 126-126, 126-127, 126-128). Drew Court received a rating of 58.97, and Sylavon Tower received a score of 42.78. (*Id.*; docs. 126-127, 126-128). Only Sylavon Court received a rating of 71.04, which is considered passing. (Doc. 126-126; doc. 126-119 at 8). Mr. Threatt did not provide these inspection scores to the BOC. (Doc. 126-119 at 8).

Commissioner Lozito, who was then Chair of the BOC, emailed Mr. Threatt on July 22, 2019 and again on July 29, 2019 requesting numerous documents, including a copy of Mr. Threatt's employment contract, SHA's budget, information on SHA's bank accounts, a list of all SHA employees and current salaries, and a list of all SHA contractors and copies of contracts. (Doc. 126-119 at 3–5; *see also* doc. 126-122). Because the request was initiated through Commissioner Lozito's personal accounts rather than the official email address Mr. Threatt had created for him, Mr. Threatt ignored both emails. (Doc. 126-119 at 3–4). Less than a week after

Commissioner Lozito's request for documents, Mr. Threatt began the process to apply for leave under the FMLA, citing anxiety and depression, the onset of which occurred four days before. (*See* doc. 126-30 at 24–25). Ms. Daniels, the Chief Human Resources Officer, approved Mr. Threatt's request (*id.* at 19),[1] and Mr. Threatt thereafter delegated his responsibilities to Ms. Mueller, Ms. Daniels, and Ms. Womack (doc. 126-33).

3. The BOC Places Mr. Threatt on Administrative Leave and Terminates His Employment

At some point in early September 2019, although he never reported any problems or threats to the BOC, Mr. Threatt packed up his office and moved all of his belongings out because he "[f]eared for [his] life and . . . knew [he] still could work from home." (Doc. 126-119 at 13; *see id.* at 32). Around the same time, Mr. Threatt instructed Ms. Mueller to factory restart his desktop computer and delete all of his emails and other documents so that no one at SHA could "follow [him] or get [his] personal information off of the desktop." (Doc. 126-98 at 32).

On September 5, 2019, the BOC held a special meeting to discuss placing Mr. Threatt on administrative leave. The five Commissioners who comprised the BOC at the time were Alma Cook, James Adams, Matt Hubbard, Patrick Lozito, and

---

[1] The parties apparently dispute whether Mr. Threatt was an eligible employee under the FMLA. (*See generally* doc. 126-25 at 32–35). However, Mr. Threatt does not raise a FMLA retaliation claim, and this dispute is immaterial to the present motion.

Phillip Morris. (*See* doc. 126-196). Mr. Morris, Mr. Hubbard, and Mr. Lozito are white. (Doc. 126-82 at 12). Mr. Adams and Ms. Cook are black. (*Id.*). Commissioners Morris, Hubbard, and Lozito voted in favor of placing Mr. Threatt on paid administrative leave. (Doc. 126-196). Commissioners Adams and Cook voted against it. (*Id.*). The BOC then voted unanimously to appoint Sam Royster, a white man, as acting executive director, CEO, and Secretary/Treasurer of SHA. (*Id.*).

On October 24, 2019, the BOC voted unanimously to terminate Mr. Threatt's employment with SHA. (Doc. 126-171; doc. 126-189 at 42–43).

### 4.     Mr. Threatt's Allegations of Discrimination at SHA

On September 14, 2018, longtime SHA employee Judith Maness became frustrated with SHA's new phone system that Mr. Threatt had recently implemented and stated that Mr. Threatt "should be taken around back and shot." (Doc. 137 at ¶ 26; doc. 126-80 at 17). Ms. Mueller shared an office space with Ms. Maness and overheard the comment. (Doc. 126-80 at 17). Ms. Mueller later told Mr. Threatt was Ms. Maness said about him. (*Id.*). Mr. Threatt perceived the statement as a racially motivated threat. (Doc. 137 at ¶ 27). Therefore, Mr. Threatt placed Ms. Maness on administrative leave until her retirement date, which was just two weeks later. (*Id.*; *see also* doc. 126-134).

Almost a year later, at the July 19, 2019 BOC meeting, either Commissioner Hubbard or Commissioner Morris referred to Mr. Threatt as "this black guy." (Doc. 137 at ¶ 90; doc. 126-32 at 7).

Mr. Threatt filed two EEOC charges against SHA while in its employment: one on July 25, 2019 and the other on October 22, 2019. (Doc. 126-165; doc. 126-166). His first charge alleges the BOC harassed him in retaliation for complaining about "mismanagement of funds, hazardous conditions, whistle blowing, a forensic audit[,] and a hostile work environment." (Doc. 126-165). The second reiterates the same claims as the first but claims retaliation by placing Mr. Threatt on administrative leave. (Doc. 126-166).

Just over two weeks after the Commissioners terminated Mr. Threatt's employment, Mr. Threatt filed a third EEOC charge on November 12, 2019, alleging that SHA discriminated against him based on his race and later terminated him in retaliation for reporting discrimination and misappropriation of taxpayer dollars to HUD. (Doc. 126-167). Mr. Threatt filed this lawsuit on January 20, 2020. (Doc. 1).

## II.   DISCUSSION

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Hamilton*, 680 F.3d at 1318. "[T]here is a genuine issue of material fact if

the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

SHA and Commissioners Hubbard, Lozito, and Morris move for summary judgment on all of Mr. Threatt's claims. The court addresses the claims and corresponding arguments in turn below.

1.    Count One: Title VII/§ 1981 Race Discrimination Against SHA[2]

In Count One, Mr. Threatt alleges that SHA terminated him because of his race in violation of Title VII and § 1981. (Doc. 31 at 23–24).[3] As a general rule, claims brought under Title VII and § 1981 are "subject to the same standards of proof and use the same analytical framework[.]" *Hornsby-Cullpepper v. Ware*, 906

---

[2] SHA interprets Count One as asserting both disparate treatment and hostile work environment claims. (Doc. 128 at 55); *see also Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1206–1207 (11th Cir. 2021) (listing disparate treatment claims and hostile environment claims as two different types of claims under Title VII). But Count One makes no mention of a hostile work environment, and therefore the court finds that Mr. Threatt did not sufficiently assert a hostile work environment claim under Title VII or § 1981 against SHA. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint.").

[3] Mr. Threatt's amended complaint also alleges that SHA discriminated against him because of his race by denying his salary and contractual salary increases and by undermining his authority. (Doc. 31 at ¶ 106). But his response in opposition to summary judgment addresses his termination as the only possible adverse action for purposes of his Title VII § 1981 disparate treatment claim against SHA. (*See* doc. 138 at 44, 46, 51). Because Mr. Threatt does not make any argument about SHA denying his salary and contractual salary increases or by undermining his authority, the court does not address these potential adverse actions. *See United States v. Campbell*, 26 F.4th 860, 890 (11th Cir. 2022) (explaining that a party forfeits an argument or issue "when a party fails to raise an argument or issue in its brief").

F.3d 1302, 1312 n.6 (11th Cir. 2018). A plaintiff may prove a claim of intentional discrimination through either direct evidence, circumstantial evidence, or statistical proof. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022); *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008). Mr. Threatt relies on circumstantial evidence to prove his claim. (Doc. 138 at 43).

Generally, if a plaintiff supports his claim of discrimination with circumstantial evidence, the court applies the test set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If a plaintiff cannot prove discrimination via the *McDonnell Douglas* test, a discrimination claim still may survive summary judgment if the plaintiff "'presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Jenkins*, 26 F.4th at 1250 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Mr. Threatt relies <u>only</u> on these two theories. (Doc. 138 at 43–52).[4]

---

[4] The section of Mr. Threatt's brief that addresses his race discrimination claims cites *Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1084 (11th Cir. 1996), for the proposition that plaintiffs also may prove intentional discrimination claims under a mixed-motive theory of discrimination which requires a plaintiff to show only that race motivated an employment decision, even if other factors motivated the decision as well. (Doc. 138 at 42). But the substance of Mr. Threatt's brief advances no argument about why his race discrimination claim against the SHA survives summary judgment under a mixed-motive theory. (*Id.* at 43–52). Instead, the brief only addresses the *McDonnell Douglas* and the circumstantial mosaic theories. (*Id.*). Citing a case for a general legal principle, without more, is insufficient to tie that law to his claim, and the court will not make arguments on Mr. Threatt's behalf. Accordingly, the court finds that Mr. Threatt has forfeited any mixed-motive argument. *See Campbell*, 26 F.4th at 890.

### a.    McDonnell Douglas Framework

First, Mr. Threatt contends he has sufficient evidence to survive summary judgment under the *McDonnell Douglas* burden-shifting framework. "When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his] employer treated similarly situated employees outside [his] class more favorably." *Lewis v. City of Union City.*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (quotation marks omitted). If a plaintiff makes this initial showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment action. *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If a defendant sustains its burden to put forth legitimate, non-discriminatory reasons for its actions, the plaintiff must demonstrate that the proffered reasons were pretext for unlawful discrimination. *Id.*

SHA argues that it is entitled to summary judgment on Mr. Threatt's Title VII and § 1981 race discrimination claim because he is unable to establish a *prima facie* case and, alternatively, because he is unable to prove that SHA's legitimate, non-discriminatory reasons for terminating him are pretext for discrimination. (Doc. 128 at 61–63). The court will address each argument in turn.

SHA first argues Mr. Threatt cannot demonstrate that SHA treated similarly situated employees outside of his protected class more favorably. (Doc. 128 at 61–62). To satisfy the fourth element of a *prima facie* case under *McDonnell Douglas*, Mr. Threatt must identify a comparator who is "similarly situated in all material respects." *Lewis*, 918 F.3d at 1218 (quotation marks omitted). Mr. Threatt acknowledges that he does not have a comparator, but citing *Rioux*, 520 F.3d at 1276–77, Mr. Threatt contends that he nonetheless can establish a *prima facie* case because SHA replaced him with someone from outside of his protected class. (Doc. 138 at 44). The court is unpersuaded by Mr. Threatt's argument.

*Rioux* predates the Eleventh Circuit's decision in *Lewis*, which held that a *prima facie* case of discrimination under the *McDonnell Douglas* framework requires a plaintiff to prove "that []he was treated less favorably than 'similarly situated' individuals outside [his] class." *Lewis*, 918 F.3d at 1224. Because Mr. Threatt cannot identify a similarly situated comparator, he does not establish a *prima facie* case under *McDonnell Douglas* and must rely on another method by which to prove his claims. *See Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021) ("[T]he 'convincing mosaic' theory can be of particular significance when the plaintiff cannot identify a similarly situated comparator.").

However, even if Mr. Threatt could establish a *prima facie* case, his claims would still fail because he does not present evidence that SHA's reasons for terminating him are pretext for discrimination.

SHA contends generally that it terminated Mr. Threatt "because he was dishonest, he was greedy, he did not come to work, he did not do his job, he increased his own salary by deception and coercion, he created unnecessary jobs for his former colleagues at ridiculously exorbitant salaries, and [he] caused the Housing Authority to lose money." (Doc. 128 at 4). However, in the relevant section of its brief, SHA relies on just four specific reasons for terminating Mr. Threatt's employment: (1) Mr. Threatt did not respond to Commissioner Lozito's requests for financial documents, (2) Mr. Threatt paid his chief officers excessive salaries, (3) Mr. Threatt failed to properly maintain SHA properties, and (4) Mr. Threatt terminated the lease for the Head Start center. (*Id*. at 66).

The reasons SHA proffered for terminating Mr. Threatt are legitimate and non-discriminatory. Therefore, the burden shifts to Mr. Threatt to provide evidence demonstrating that those reasons are mere pretext for discrimination. *Burdine*, 450 U.S. at 253. To do so, Mr. Threatt must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original). Because SHA presents multiple legitimate, non-discriminatory reasons for its actions, Mr. Threatt must rebut each one to

17

survive summary judgment. *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007).

Mr. Threatt generally argues that some of the proffered reasons are subjective and that none of them are supported by evidence. (*See generally* doc. 138 at 44–51). His arguments are insufficient for two separate and independent reasons.

First, with the exception of acknowledging that his decision to pay his executive staff excessive salaries is a legitimate, non-discriminatory reason, Mr. Threatt does not respond to SHA's decision to terminate his employment on this basis. (*See generally* doc. 138 at 44–51). Because Mr. Threatt has presented no evidence regarding whether this legitimate, non-discriminatory reason is pretext for his termination, SHA is entitled to summary judgment on Mr. Threatt's Title VII and § 1981 discrimination claim. *See Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) ("In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual.") (emphasis added).

Second, he cannot establish the falsity of any of SHA's proffered reasons for his termination. By his own admission: (1) Mr. Threatt did not respond to Commissioner Lozito's email requesting certain documents (doc. 128 at 26–27 ¶ 108; doc. 138 at 17 ¶ 108; *see also* doc. 126-119 at 3–5); he terminated the Head Start lease (doc. 128 at 22 ¶¶ 86–89; doc. 138 at ¶¶ 86–89; *see also* doc. 126-38 at

24–25; doc. 126-47); SHA's properties were in "poor condition" twenty-one months after he became executive director (doc. 128 at 20 ¶ 82; doc. 138 at ¶ 82); and he gave substantial salary increases and bonuses to members of his executive team even though SHA was operating at a million-dollar deficit (doc. 128 at ¶¶ 32–34; doc. 138 at ¶¶ 32–34; *see also* doc. 126-80 at 79–80; doc. 126-25 at 16; doc. 126-145 at 8–9). Because Mr. Threatt has not established that any of SHA's stated reasons for his termination were false, Mr. Threatt cannot survive summary judgment under the *McDonnell Douglas* framework. *Hicks*, 509 U.S. at 515.

       *b.*    *Convincing Mosaic*

Mr. Threatt alternatively argues that he presents a convincing mosaic of circumstantial evidence that would allow a jury to infer that SHA terminated him because of his race. (Doc. 138 at 52).

"Aside from the *McDonnell Douglas* framework, an employee can still survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Jenkins*, 26 F.4th at 1250 (quoting *Smith*, 644 F.3d at 1328). "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Id.* (quoting *Lewis*, 934, F.3d at 1185).

Mr. Threatt's brief does not explicitly articulate what pieces of evidence he claims constitute his convincing mosaic. (*See* doc. 138 at 51–52). The brief states only, "[w]ithout rehashing the arguments above, Threatt's disparate treatment claim advances under the convincing mosaic standard as well." (*Id.* at 52). The only arguments Mr. Threatt addresses "above" are those related to his alleged comparator and pretext. (*Id.* at 44–51). The court has already explained that Mr. Threatt has not shown that SHA treated a similarly situated employee more favorably and that he has not presented evidence that SHA's legitimate, non-discriminatory reasons for terminating him are pretext for discrimination. Therefore, to the extent he relies on any alleged comparator and evidence of pretext to support his convincing mosaic, this argument fails.

The only evidence of discrimination Mr. Threatt provides is one statement made by either Commissioner Hubbard or Morris referring to Mr. Threatt as "that black guy," as well as the fact that SHA replaced Mr. Threatt as executive director with Sam Royster, who is white. (*See* doc. 138 at 44–45). Mr. Threatt does not cite, and the court has not located, authority suggesting that these two instances, standing alone, are insufficient to establish a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by SHA. *Cf. Jenkins*, 26 F.4th at 1250-51 (finding that plaintiff provided a convincing mosaic of discrimination where the evidence showed, among other things, that a similarly

situated employee committed the same work rule violation but remained employed; that eighteen members of plaintiff's protected class "retired, resigned, or transferred from" the relevant department since a particular supervisor took charge; that the supervisor mistreated three other employees in plaintiff's protected class; that the supervisor made racially-biased comments about employees in plaintiff's protected class; and that the supervisor provided shifting reasons for the plaintiff's termination).

Accordingly, the court **WILL GRANT** SHA's motion and **WILL ENTER SUMMARY JUDGMENT** in favor of SHA and against Mr. Threatt on Count One.

2.      Count Two: Title VII/§ 1981 Retaliation Against SHA

In Count Two, Mr. Threatt asserts a claim for retaliation against SHA pursuant to Title VII and § 1981. (Doc. 31 at 25–26). Mr. Threatt alleges that SHA put him on paid leave and terminated his employment in retaliation for reporting complaints about race discrimination and for filing EEOC charges. (*Id.*).[5]

---

[5] Mr. Threatt's amended complaint also alleges that SHA retaliated against him in violation of Title VII and § 1981 by interfering with the day-to-day operations of SHA, interfering with his job duties, creating and fostering a hostile work environment, and publishing Mr. Threatt's confidential and medical information. (Doc. 31 at ¶ 119). But Mr. Threatt's response in opposition to summary judgment addresses only his paid leave and termination as the adverse actions as forming the basis of his Title VII and § 1981 retaliation claim against SHA. (*See* doc. 138 at 44, 46, 51). Therefore, the court finds that Mr. Threatt has forfeited any argument with respect to any other adverse action. *See Campbell*, 26 F.4th at 890.

To establish a claim for retaliation under Title VII and § 1981, a plaintiff must first establish a *prima facie* case by showing: (1) that he "engaged in statutorily protected activity," (2) that he "suffered an adverse action," and (3) "that the adverse action was causally related to the protected activity." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (quotation marks omitted). The burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* The plaintiff then must demonstrate that the proffered reason is pretext for retaliation. *Id.*

### a.   *Retaliatory Paid Administrative Leave*

First, Mr. Threatt alleges that SHA unlawfully retaliated against him by placing him on administrative leave. (Doc. 138 at 54). SHA's only argument with respect to Mr. Threatt's retaliation claim based on his administrative leave is that he cannot establish a *prima facie* case because: (1) he did not engage in protected activity, and (2) administrative leave with pay is not an adverse action. (Doc. 128 at 69–70 & n.13).[6]

---

[6] SHA's brief in support of its motion for summary judgment argues that Mr. Threatt cannot establish a causal connection between any alleged protected conduct and his termination and that he cannot establish SHA's reasons for terminating his employment are pretext for unlawful retaliation. (Doc. 128 at 69–70). But SHA makes no similar arguments with respect to its decision to place Mr. Threatt on administrative leave. Therefore, SHA has forfeited any other arguments as it concerns Mr. Threatt's retaliation claim based on his administrative leave. *See Campbell*, 26 F.4th at 890.

### i.      Protected Conduct

In the Eleventh Circuit, protected activity under Title VII's retaliation provision can take two forms: opposition or participation. *EEOC. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000). "Under the opposition clause, an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.'" *Id.* (quoting 42 U.S.C. § 2000e–3 (a)). "[U]nder the participation clause, an employer may not retaliate against an employee because the employee 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Id.* (quoting 42 U.S.C. § 2000e-3(a)).

Mr. Threatt contends he engaged in protected activity on two occasions: (1) when he opposed discriminatory practices during the August 19, 2019 BOC meeting, and (2) when he filed his October 22, 2019 EEOC charge. (Doc. 138 at 53–54).

Mr. Threatt's brief identifies the following complaints or comments he made to the BOC at the August 19, 2019 meeting as examples of conduct he claims is protected under Title VII's opposition clause: (1) his belief that SHA had created a racially hostile work environment; (2) that the BOC lacked diversity and needed more minority representation; (3) concern about compliance with the Civil Rights Act of 1968; (4) whether the practices of SHA had a disparate impact on equal opportunity and equal access to housing; (5) whether the SHA had segregated

housing; and (6) the Department of Justice's 2016 investigation of potential Fair Housing Violations based on race. (Doc. 138 at 53).

To demonstrate that conduct falls within the protection of the opposition clause, a plaintiff "must show that [he] 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1312 (11th Cir. 2002) (quoting *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). "It ... is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Little,* 103 F.3d at 960.

Complaints about compliance with the Civil Rights Act of 1968 and whether SHA's housing practices were discriminatory do no concern potential unlawful employment practices under Title VII. Therefore, these complaints are not protected conduct. The only remarks from the August 19, 2019 meeting that arguably implicate unlawful employment practices under Title VII are Mr. Threatt's claims about a potentially racially hostile work environment and the BOC's need for more minority representation. But a close review of the specific comments demonstrate that they are not protected conduct for purposes of Mr. Threatt's retaliation claim.

During the August 19, 2019 BOC meeting, Mr. Threatt began his remarks to the BOC by stating in broad and general terms:

[W]e have had to close for a couple of weeks here or close the office early due to a hostile work environment, and we wanted to make sure that our resident staff understood that, we want to make sure that everyone was safe and sound. And, too, make sure that our staff then understands that there was an Employee Assistance Program that's available for them based on those things, the anxiety or depression-type symptoms that may have come up.

Finally, as I speak to the hostile work environment, I want to speak to what it means specifically in the workplace and what has to do with difficulty or uncomfortable situations for staff or even for our residents to experience, for harassments, for any type of thing, it could be any type of retaliation or anything of that nature.

(Doc. 126-231 at 9).

Later in the meeting, Commissioner Lozito asked Mr. Threatt to clarify and describe the alleged hostile work environment. (*Id.* at 13). Mr. Threatt asked Ms. Daniels to respond to the question. (*Id.*). Ms. Daniels told Commissioner Lozito that several SHA employees had approached her after certain events on SHA property and complained that "they were worried and stressed and just feeling like they were being no less than bullied by outsiders, by outside stakeholders." (*Id.*). This evidence shows that Mr. Threatt characterized treatment of SHA employees by individuals outside the SHA as a racially hostile work environment. But Mr. Threatt's belief that employees being bullied or harassed by SHA "outsiders" constitutes a racially hostile work environment under Title VII is not objectively reasonable because that conduct does not relate to any alleged discriminatory employment practice. Rather,

it concerns the conduct of individuals with no employment relationship to SHA employees.

Mr. Threatt's remarks about minority representation fare no better. During the August 19, 2019 meeting, Mr. Threatt also told the BOC that within his first week of being Executive Director, he received emails from minority contractors who expressed hope that they would "be able to get contracts with the [SHA] because that had not been done previously." (Doc. 126-231 at 10). Mr. Threatt stated that SHA had made progress and was now "doing those things." (*Id.*). Mr. Threatt made these comments in the context SHA's obligations to complying with the Civil Rights Act of 1968, not Title VII. Therefore, Mr. Threatt's praise that the SHA had begun to hire minority contractors does not constitute opposition to a discriminatory employment practice under Title VII. Therefore, this conduct likewise is not protected expression under the opposition clause.

Although Mr. Threatt's comments during the August 19, 2019 BOC meeting are not protected conduct, Mr. Threatt's filing of an EEOC charge is expressly protected by the participation clause. 42 U.S.C. § 2000e-3(a); *Total Sys. Servs., Inc.*, 221 F.3d at 1174. Therefore, Mr. Threatt has shown that he engaged in protected conduct when he filed his October 22, 2019 EEOC charge.

### ii.    Adverse Action

For purposes of a retaliation claim under Title VII, an adverse action is one that is "likely to dissuade employees from complaining or assisting in complaints about discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006). The Eleventh Circuit has recognized that a thirty-day suspension with pay constitutes an adverse employment action in the retaliation context. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993). Here, SHA placed Mr. Threatt on paid leave from September 5, 2019 until his termination on October 24, 2019. (*See* doc. 126-182; doc. 126-171). Under *Hairston*, Mr. Threatt's forty-two day paid administrative leave constitutes an adverse action for purposes of his Title VII retaliation claim.

SHA cites *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261 (11th Cir. 2021), for the proposition that paid leave is not an adverse action. (Doc. 128 at 70 n.13). In *Davis*, the plaintiff argued on appeal that the district court erred in finding that a paid suspension "could not constitute an adverse employment action for purposes of his race-<u>discrimination</u> claim." *Davis*, 19 F.4th at 1263 (emphasis added). In answering that question, the Eleventh Circuit began its analysis by citing Title VII's anti-discrimination provision and noted that to prevail on a race discrimination claim, a plaintiff must show he was subject to a tangible adverse employment action. *Id.* at 1265–66. The Court then noted that "[w]hether suspension with pay can rise to the

level of an adverse employment action in <u>discrimination</u> cases" was an issue of first impression in the Eleventh Circuit. *Id.* at 1266 (emphasis added). The Court joined other Circuits and held that "a simple paid suspension is not an adverse employment action." *Davis*, 9 F. 4th at 1267.

In reaching its conclusion, the Court noted its holding in *Hairston* and explained that paid suspensions "may constitute an adverse action in the *retaliation* context" because in retaliation cases, "[t]he standard to show an adverse employment decision . . . is more relaxed." *Id.* at 1266 n.3 (emphasis in original). Accordingly, contrary to SHA's position, *Davis* did not hold that paid administrative leave or a paid suspension is not an adverse employment action for purposes of a retaliation claim. Nor could it have. The issue was not before the Court, and even if it were, *Hairston* is binding precedent and in the Eleventh Circuit, the Court is "bound to follow a prior binding precedent unless and until it is overruled by" the Eleventh Circuit en banc or by the United States Supreme Court. *United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008).

The only arguments that SHA makes in support of summary judgment on Mr. Threatt's Title VII and § 1981 retaliatory paid leave claim are not persuasive because Mr. Threatt engaged in protected conduct when he filed his October 22, 2019 EEOC charge and because his paid administrative leave is an adverse action. Accordingly,

the court **WILL DENY** SHA's motion for summary judgment on Count Two to the extent the claim is based on SHA placing Mr. Threatt on administrative leave.

   b. *Retaliatory Termination*

Second, Mr. Threatt alleges that SHA unlawfully retaliated against him by terminating his employment. (Doc. 138 at 54). SHA argues that Mr. Threatt's retaliatory termination claim under Title VII and § 1981 fails because he cannot establish a *prima facie* case, and even if he could, Mr. Threatt cannot rebut SHA's legitimate, nonretaliatory reasons for terminating him. (Doc. 128 at 67–70). Because the court finds that SHA is entitled to summary judgment based on its second argument, the court assumes without deciding that Mr. Threatt has established a *prima facie* case of retaliatory termination.

The court has discussed SHA's proffered reasons for terminating Mr. Threatt's employment above. *See supra* at 17–18. And, as already explained, Mr. Threatt fails to carry his burden of demonstrating that those proffered reasons are pretext for either discrimination or retaliation. *See supra* at 18–19. Accordingly, SHA is entitled to summary judgment on Mr. Threatt's Title VII and § 1981 retaliation claim in Counts Two to the extent the claim is based on Mr. Threatt's termination.

Accordingly, the court **WILL GRANT** SHA's motion on Mr. Threatt's Title VII and § 1981 retaliation claim to the extent it is based on Mr. Threatt's termination.

The court **WILL ENTER SUMMARY JUDGMENT** in SHA's favor and against Mr. Threatt on Count Two to the extent it is based on Mr. Threatt's termination.

     3.    Count Three: Fair Housing Act Retaliation Against SHA

In Count Three, Mr. Threatt alleges that SHA placed him on paid leave in violation of the Fair Housing Act for complaining about issues of housing discrimination and segregation.[7]

The Fair Housing Act's anti-retaliation provision makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" the Act. 42 U.S.C. § 3617. The court analyzes Fair Housing Act retaliation claims under the same framework as Title VII retaliation claims. *Fox v. Gaines*, 4 F.4th 1293, 1296 (11th Cir. 2021) ("When interpreting the [Fair Housing Act], we—like our sister circuits—look to cases interpreting Title VII, which uses language virtually identical to the [Fair Housing Act's].") *see also Philippeaux v. Apartment Inv. & Mgmt. Co.*, 598 F. App'x 640, 644 (11th Cir. 2015) (to establish a *prima facie* case of retaliation under the Fair Housing Act, "a plaintiff must show

---

[7] Mr. Threatt's amended complaint also alleges retaliatory termination under the Fair Housing Act. (Doc. 31 at ¶¶ 138–39). But Mr. Threatt's brief in opposition to summary judgment addresses only SHA's decision to place him on paid leave as the only basis for his Fair Housing Act retaliation claim. (Doc. 138 at 57). Therefore, Mr. Threatt has forfeited any argument about his termination for purposes of his Fair Housing Act Claim. *See Campbell*, 26 F.4th at 890.

that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action.") (quotation marks omitted).[8]

SHA argues that it is entitled to summary judgment on Mr. Threatt's Fair Housing Act retaliation claim because he did not engage in protected activity. (Doc. 128 at 75–76).[9] Neither party cites, and the court has not located, binding authority establishing what constitutes protected activity under the Fair Housing Act. But in *Philippeaux*, which SHA cites, the Eleventh Circuit, in an unpublished decision, explained that, like in the Title VII context, a plaintiff asserting a Fair Housing Act retaliation claim must have "a good faith, reasonable belief that the" conduct about which he protests is unlawful, even if ultimately the conduct is lawful. *Philippeaux*, 598 F. App'x at 644–45. Mr. Threatt does not argue that a different standard applies (*see* doc. 138 at 57), and the court finds *Philippeaux* persuasive to the extent it requires a plaintiff alleging retaliation under the Fair Housing Act to show that he reasonably believes that the conduct he opposes is unlawful.

---

[8] The court cites *Philippeaux* as persuasive authority. *See McNamara v. Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1060–61 (11th Cir. 2022); *see also* 11th Cir. R. 36-2.

[9] SHA argues that even if Mr. Threatt engaged in protected activity, he has not established a causal connection between that activity and his termination and that he has not rebutted SHA's legitimate non-retaliatory reasons for his termination. (Doc. 128 at 75–76). But Mr. Threatt bases his Fair Housing Act retaliation claim only on SHA's decision to place him on administrative leave. (Doc. 138 at 57). Neither SHA's brief in support of its motion for summary judgment nor its reply brief addresses causation or legitimate, non-discriminatory reasons with respect to Mr. Threatt's administrative leave. (Doc. 128 at 75–78; doc. 150 at 37–38). Accordingly, SHA has forfeited any such argument. *See Campbell*, 26 F.4th at 890.

Mr. Threatt contends that he engaged in protected conduct when he "raised issues of compliance with the anti-discrimination provisions of the Fair Housing Act of 1968" during his comments to the BOC at the August 16, 2019 meeting. (Doc. 138 at 57). The Fair Housing Act prohibits discrimination in the sale or rental of housing, or in the provision of related services, on the basis of race, color, religion, sex, familial status, national origin, or handicap. 42 U.S.C. §§ 3604, 3605, 3606. Based on the portion of the transcript from the August 16, 2019 meeting Mr. Threatt cites (doc. 138 at 57, citing doc. 126-231 at 9–10), three of his comments potentially bear on the Fair Housing Act's anti-discrimination provisions.

First, Mr. Threatt stated that in 2016, SHA "received a Department of Justice finding for [a] Fair Housing violation based on race for violating the Civil Rights Act and for Fair Housing. And speaking to the board and to the HUD field office, no one had that knowledge. Since then it has closed down but those issues were still there." (Doc. 126-231 at 9). Second, Mr. Threatt stated that SHA "must meet and exceed [] fair housing." (*Id.* at 10). He told the BOC that SHA had recently hosted a fair housing symposium that few elected officials, BOC members, or members of the community attended. (*Id.*). Mr. Threatt considered it "a major ordeal" because there were "a lot of things coming out from the HUD as regard to desperate [sic] impact and making sure everyone has equal opportunity and equal access. And we want to make sure we are doing those things." (*Id.*). Third, Mr. Threatt told the BOC

that Sylavon Court was mis-designated because it should have been a family development. (Doc. 126-231 at 9). He told the BOC that it would soon receive information as SHA began "to provide access to family development again." (*Id.*).

Mr. Threatt's first and second comments do not constitute protected activity under the Fair Housing Act. First, the record demonstrates that Mr. Threatt cannot show that he reasonably believed that the Department of Justice cited SHA for a race-based fair housing violation in 2016. In December 2016, the Department of Justice initiated an investigation against SHA into potential violations of the Fair Housing Act. (Doc. 126-232 at 2). The letter from the Department of Justice notifying SHA of the investigation stated the Department of Justice had "not made any determination as to whether" SHA had violated the SHA. (*Id.*). SHA responded to the Department's requests for information (*id.* at 7–11), and in August 2018, the Department of Justice notified SHA that the investigation was complete and that no "further action [was] warranted" at the time (*id.* at 6).

Just one month before the August 2019 BOC meeting, Mr. Threatt wrote a letter to HUD explaining that the Department of Justice completed an investigation but determined not to take additional action. (Doc. 126-232 at 1). Because the evidence shows that Mr. Threatt knew that the Department of Justice had not cited SHA for any violations based on the 2016 investigation, Mr. Threatt could not have

had an objectively reasonable belief that SHA violated the Fair Housing Act's anti-discrimination provisions based on the 2016 Department of Justice investigation.

Second, Mr. Threatt cannot show that he had a good faith reasonable belief SHA was violating the Fair Housing Act by expressing his desire for SHA to comply with the Fair Housing Act. Comments about SHA meeting and exceeding Fair Housing standards in the general sense is not protesting a particular alleged unlawful activity under the Fair Housing Act.

This leaves Mr. Threatt's comment to the BOC that Sylavon Court was improperly designated and therefore unlawfully excluding families. Mr. Threatt testified in his deposition that he believed that Sylavon Court was improperly designated as elderly and disabled housing instead of family housing because after speaking with a HUD field officer in the spring of 2019, he searched SHA's records and found no documentation that HUD had approved Sylavon Court for elderly and disabled housing only. (Doc. 126-98 at 72–73). Shortly after Mr. Threatt's termination, HUD conducted a compliance review, and found that SHA was "operating Sylvan [sic] Court as an Elderly development without documentation that it was constructed as Elderly or approved as Designated Housing by HUD." (Doc. 126-208 at 2). HUD instructed SHA to "either provide documentation that Sylvan [sic] Court was constructed as an elderly development, apply to HUD for Designated Housing status, or begin operating it as a family development." (*Id.* at 2–3). SHA

34

later found documentation showing that Sylavon Court originally was constructed applied to HUD for designation of Syalvon Court as elderly and disabled housing only. (Doc. 126-74 at 1–3, 18, 21; doc. 126-191 at 58).

Given that Mr. Threatt could not locate documentation from HUD designating Sylavon Court as elderly and disabled housing only and that HUD found that SHA was operating Sylavon as elderly housing only without approval from HUD, a reasonable jury could infer that "he had a good faith, reasonable belief" that the conduct discriminated against families in violation of the Fair Housing Act. *Little*, 103 F.3d at 960. Indeed, SHA does not argue that Mr. Threatt's belief that SHA was violating the Fair Housing Act by excluding families from Sylavon Court was unreasonable. Instead, without citing any evidence or legal authority, SHA argues that Mr. Threatt's comment about Sylavon Court is not protected conduct because Mr. Threatt "merely informed the BOD of HUD's (mistaken) belief the Sylavon properties were incorrectly designated" because the properties always had been properly designated as elderly and disabled housing which HUD later acknowledged and Mr. Threatt did not investigate whether that designation was correct. (Doc. 128 at 75–76).

But whether Mr. Threatt's belief ultimately was mistaken is not the question because showing a "good faith reasonable belief" does not require a plaintiff to demonstrate that a defendant was, a matter of fact, engaged in an unlawful practice.

35

*Little*, 103 F.3d at 960. And SHA cites no authority suggesting that a plaintiff must investigate the facts surrounding a good faith reasonable belief that a defendant is engaged in unlawful activity before complaints about that conduct can constitute protected activity.

Accordingly, the court finds Mr. Threatt can show that he engaged in protected activity under the Fair Housing Act when he told the BOC that SHA improperly designated Syalvon Court as elderly and disabled housing to the exclusion of families. Because SHA makes no other argument in support of summary judgment on Mr. Threatt's claim that SHA retaliated against him in violation of the Fair Housing Act by placing him on administrative leave, the court **WILL DENY** SHA's motion for summary judgment on Count Three.

> 4.   Count Four: False Claims Act Retaliation Against SHA

In Count Four, Mr. Threatt alleges that SHA suspended him and terminated his employment in violation of the False Claims Act for reporting fraudulent billing practices. (Doc. 31 at ¶¶ 141–42).

The False Claims Act prohibits "making false claims for payment to the United States." *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1086 (11th Cir. 2018). The False Claims Act also protects employees against retaliation for engaging in conduct "in furtherance of an action under [the False Claims Act] or other efforts to stop 1 or more violations" of the False Claims Act.

31 U.S.C. § 3730(h)(1). To prevail on a claim for retaliation under the False Claims Act, an employee must show that he engaged in protected activity and that there is a causal connection between the retaliation and the protected activity. *See Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1359–60 (11th Cir. 2020); *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303–04 (11th Cir. 2010).

Mr. Threatt alleges that, after becoming executive director, he "reported what he believed to be fraudulent billing practices to the Board of Commissioners." (Doc. 31 at ¶ 142). He claims that, as a result, SHA placed him on administrative leave and subsequently terminated his employment. (*Id.* at ¶¶ 151, 154).

SHA contends that Mr. Threatt's False Claims Act retaliation claim fails for two reasons: (1) Mr. Threatt did not engage in protected activity under the False Claims Act, and (2) Mr. Threatt's complaints were not the "but for" cause of his termination. (Doc. 128 at 68–71). The court agrees that Mr. Threatt did not engage in protected activity under the False Claims Act and therefore does not address SHA's alternative argument.

The Eleventh Circuit has interpreted the retaliation provision of the False Claims Act as only protecting employees if the "suspected misdeeds are a violation of the *False Claims Act*, not just of general principles of ethics and fair dealing." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021) (emphasis in original). Therefore, "[i]t is not enough for an employee to suspect

fraud; it is not even enough to suspect misuse of federal funds." *Id.* Rather, "an employee must suspect that her employer has made a false claim to the federal government." *Id*.

The evidence demonstrates that Mr. Threatt's complaints concerned general mismanagement of federal funds, not SHA's submission of false claims to the government. SHA engaged an accounting firm to conduct a forensic review for the period of Fiscal Year 2014 through Fiscal Year 2018 "after the discovery of certain transactions of a dubious nature." (Doc. 126-41 at 4). The forensic review found various deficiencies in SHA's management of federal funds, but it is undisputed that none of the findings in the review relate to SHA's submission of a false claim to the government. (*See* doc. 126-41; doc. 126-98 at 64; doc. 128 at ¶ 216; doc. 138 at ¶ 216).

Mr. Threatt communicated the findings of this fiscal review to the BOC and to a HUD Special Agent. (Doc. 137 at ¶ 30). He then engaged a different accounting firm to conduct a financial audit. (*Id*. at ¶¶ 47, 48). The accounting firm completed this audit on March 18, 2019 and provided its findings to the BOC. (*See* doc. 126-85 at 32). Mr. Threatt does not dispute that the findings of the March 2019 audit relate to general mismanagement of funds and do not relate to SHA's submission of a false claim to the government. (Doc. 128 at 53 ¶¶ 220, 221; doc. 138 at ¶¶ 220, 221; *see also* doc. 126-85; doc. 126-98 at 64).

Mr. Threatt testified that the only "fraudulent billing practices" on which he based his claim were SHA's: (1) "[f]ailure to adhere to the basic reporting and recording requirements of the FHA/HUD in the utilization of federal funds;" (2) "[f]ailure to follow basic rules of project-based budgeting, accounting, and reporting, and generally accepted accounting principles[;]" (3) "[m]ismanagement, and misallocation of federal funds;" and (4) "[l]ack of internal controls and internal policies to ensure transparency; and, accountability and general checks and balances." (Doc. 31 at ¶¶ 43(f)–(i); doc. 126-98 at 66–67). Mr. Threatt has not presented evidence that he complained about conduct that he reasonably believed were violations of the False Claims Act. Accordingly, he did not engage in protected activity under the False Claims Act. *See Hickman*, 985 F.3d at 1289–90.

Therefore, the court **WILL GRANT** SHA's motion for summary judgment on Mr. Threatt's False Claims Act retaliation claim and **WILL ENTER SUMMARY JUDGMENT** in favor of SHA and against Mr. Threatt on Count Four.

5.  Count Five: § 1983 Equal Protection Claims Against Commissioners Hubbard, Lozito, and Morris

In Count Five, Mr. Threatt asserts § 1983 claims against Commissioners Hubbard, Lozito, and Morris for denial of his equal protection rights in violation of the Fourteenth Amendment when they made the decision to terminate his

employment. (Doc. 31 at ¶ 157).[10] Mr. Threatt seeks damages against Commissioners Hubbard, Lozito, and Morris in their individual capacities and prospective injunctive relief against these defendants in their official capacities. (*Id.*).

The only argument that Commissioners Hubbard, Lozito, and Morris make with respect to Count Five is that they are entitled to qualified immunity from Mr. Threatt's § 1983 claims against them. (Doc. 128 at 66–67). "Qualified immunity offers complete protection for government officials sued in their <u>individual</u> <u>capacities</u> if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation marks omitted) (emphasis added). A defendant asserting qualified immunity as a defense must first show that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* (quotation marks omitted). Here, Commissioners Hubbard, Lozito, and Morris contend that they were exercising their discretionary authority when they voted to terminate Mr. Threatt's contract (doc. 128 at 67), and

---

[10] To the extent the court can liberally construe Mr. Threatt's counseled complaint as asserting § 1983 claims against Commissioners Hubbard, Lozito, and Morris based on a racially hostile work environment, the undisputed evidence does not support Mr. Threatt's contention that anyone at SHA subjected him to a racially hostile work environment. The conduct that Mr. Threatt claims constitutes a racially hostile work environment (see doc. 138 at 57) either is not based on his race or is not "sufficiently severe or pervasive to alter the conditions of [his] employment" or to "create an abusive working environment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299 (11th Cir. 2012) (quotation marks omitted) (alterations adopted).

Mr. Threatt does not challenge that these defendants were acting in their discretionary authority (*see* doc. 138 at 52). Thus, the burden shifts to Mr. Threatt "to show that qualified immunity is not appropriate." *Dalrymple v. Reno*, 334 F.3d 991, 995 (11th Cir. 2003). This requires Mr. Threatt to demonstrate that Commissioners Hubbard, Lozito, and Morris violated a constitutional right and that the right was clearly established at the time of the violation. *Vinyard*, 311 F.3d at 1346.

Mr. Threatt's § 1983 discrimination claim has the same elements and is subject to the same analysis as his Title VII discrimination claim. *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). As explained above, Mr. Threatt cannot establish a *prima facie* case of race discrimination, and he has not rebutted the legitimate, non-discriminatory reasons for his termination. *See supra* pp. 17–19. In addition, he has not pointed to a convincing mosaic of circumstantial evidence from which a trier of fact could infer that SHA terminated him because of his race. *See supra* pp. 19–21. Accordingly, Mr. Threatt cannot show that Commissioners Hubbard, Lozito, and Morris violated his equal protection rights when they voted to terminate his contract with SHA, and these defendants are entitled to qualified immunity on Mr. Threatt's individual capacity § 1983 claims against them. Accordingly, the court **WILL GRANT** Commissioners Hubbard, Lozito, and

Morris's motion for summary judgment on Count Five to the extent it asserts individual capacity claims.

Mr. Threatt also asserts official capacity § 1983 claims against Commissioners Hubbard, Lozito, and Morris for prospective injunctive relief. (Doc. 31 at ¶ 157). Because Mr. Threatt's individual capacity claims against these defendants fail as a matter of law, the court questions what relief these defendants, in their official capacities, could provide to Mr. Threatt. But qualified immunity does not apply to official capacity claims. *Bruce v. Beary*, 498 F.3d 1232, 1249 n.33 (11th Cir. 2007) (noting that a sheriff, sued in his official capacity, "is not, of course, entitled to . . . the individual defense of qualified immunity."). Commissioners Hubbard, Lozito, and Morris's briefing does not acknowledge Mr. Threatt's official capacity claims, nor does it move for summary judgment on any official capacity claims. (*See generally* doc. 128). Therefore, the court **WILL DENY** Commissioners Hubbard, Lozito, and Morris's motion for summary judgment on Count Five to the extent it assert official capacity claims.

## III.   CONCLUSION

The court **WILL GRANT IN PART** and **DENY IN PART** Defendants' motion for summary judgment. The court **WILL ENTER SUMMARY JUDGMENT** in favor of SHA and against Mr. Threatt on Count One; the portion of Count Two based on Mr. Threatt's termination; and Count Four. The court **WILL**

**ENTER SUMMARY JUDGMENT** in favor of Commissioners Hubbard, Lozito, and Morris and against Mr. Threatt on Count Five to the extent it asserts individual capacity claims.

The court **WILL DENY** the motion for summary judgment as to Count Two to the extent is based on Mr. Threatt's administrative leave; Count Three; and Count Five to the extent it asserts official capacity claims.

The court will enter a separate order consistent with this opinion.

**DONE** and **ORDERED** this September 28, 2022.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE